1999 ME 30

**STATE of Maine**

v.

**Nadim HAQUE.**

Supreme Judicial Court of Maine.

Argued Nov. 3, 1998.
Decided Feb. 16, 1999.

206

Andrew Ketterer, Attorney General, Nancy Torresen, Asst. Atty. Gen. (orally), Lisa P. Marchese, Asst. Atty. Gen., Augusta, for State.

William Maselli (orally), Sheila A. Cook, Auburn, for defendant.

Before WATHEN, C.J., and CLIFFORD, RUDMAN, DANA, SAUFLEY, and CALKINS, JJ.

DANA, J.

[¶1] Nadim Haque appeals from the judgment entered in the Superior Court (Androscoggin County, *Delahanty, J.*) convicting him of murder, 17–A M.R.S.A. § 201(1)(A) (1983), and assault with a dangerous weapon, 17–A M.R.S.A. § 208(1)(B) (1983). Haque contends that the trial court erred by excluding the testimony of a psychiatrist that Haque was in a "blind rage" at the time of the killing; excluding all testimony by a cultural anthropologist; and permitting a state witness to testify to out of court statements by the victim and the defendant. We affirm.

[¶2] In January 1991, Haque left his home in Raniganj, India, to attend college in Lewiston. Soon after his arrival, Haque was befriended by Lori Taylor, a fellow student. Taylor was married and living with her husband and daughter. By the summer of 1992, Haque's relationship with Taylor had developed into a love affair. In 1993, Taylor separated from her husband. The relationship between Haque and Taylor appears to have reached a peak in the summer of 1995 when Taylor expressed her desire to marry Haque. Haque said that he was not ready, and after the summer they began seeing each other less frequently.

[¶3] In the fall of 1995, Taylor became friends with Ray Hall, a neighbor in her apartment building. Their relationship became intimate in March 1996. Around the same time, Haque presented Taylor with an engagement ring and asked her to marry him. She accepted the ring but only wore it for one day.

[¶4] On April 23, 1996, Haque and Taylor attended their first counseling session with Linda Barter, a Licensed Clinical Social Worker. On May 7, Haque bought another engagement ring, a rose, and a negligee for Taylor. The next day, the two attended their second counseling session. After the session, Haque presented the gifts to Taylor and spent the night at her apartment.

[¶5] On May 10, Haque tried to reach Taylor by telephone but she would not accept his call. That same day he bought a kitchen knife. On May 11, Taylor called Haque and told him their relationship was over. The

next day, Haque rented a car and bought a can of pepper mace spray and a baseball cap. On May 13, Haque drove to Lewiston, parked two blocks from Taylor's home and let himself into her apartment. He entered her apartment wearing the cap and carrying a roll of tape, the mace, and the knife.

[¶ 6] Approximately two hours later, Taylor arrived home from work. Haque confronted Taylor, asking her why she wanted to end the relationship. Taylor responded, "we [are] just too different." Soon after this statement, Haque slashed her throat. Hall heard sounds of a struggle coming from Taylor's apartment and he entered the apartment to investigate. When Haque saw Hall he told him to "get the hell out" and then stabbed him.

[¶ 7] At trial, the defense attempted to convince the jury that Haque did not form the requisite mens rea to be guilty of murder. 17–A M.R.S.A. § 201(1)(A) (1983). The defense theory appears to have been twofold: (1) Haque was not guilty of murder because he suffered from an abnormal condition of the mind, 17–A M.R.S.A. § 38 (1983); and (2) Haque was guilty of manslaughter, rather than murder, because he acted "while under the influence of extreme anger ... brought about by adequate provocation," 17–A M.R.S.A. § 203(1)(B) (1983 & Supp.1998). The theory behind these defenses was that Haque's traditional Muslim Indian upbringing, immigrant experience and psychological condition strongly influenced his perception of his relationship with Taylor and, eventually, the way he reacted to Taylor's termination of the relationship.

[¶ 8] Dr. Bloom, the defense's medical expert, testified, inter alia, that Haque suffered from major depression and attention deficit disorder. During voir dire, Bloom discussed Haque's response to Taylor's statement, "we [are] just too different." According to Bloom, Haque interpreted her response "as [if] it was like you were telling a black person they were a nigger. To him he heard this as meaning that she saw him as being racially inferior to her." Bloom testified that as a

result of the statement, Haque was in "a state of blind rage and it was in that state of mind" that he acted. At the end of the voir dire, the court excluded any testimony that Haque "went into a rage." During the trial the court rebuffed three attempts by Haque to place this testimony into evidence.[1]

[¶ 9] The court also excluded all testimony by the defense expert, Dr. Caughey, a cultural anthropologist with an interest in psychological anthropology. He had conducted research into the experience of immigrants to the United States and how people manage multiple cultural traditions. During voir dire, Caughey discussed the various factors that affect an individual's transition between two different cultures and how those factors were relevant to Haque's experience in the United States. Caughey also discussed gender relationships in traditional Muslim India and how an understanding of that topic would help explain Haque's relationship with Taylor. According to Caughey, in traditional Muslim India there is no dating and relationships are expected to last for life. Caughey testified that given Haque's traditional Muslim upbringing, the "on again off again quality" of his relationship with Taylor "must have been ... extremely difficult to manage."

[¶ 10] On direct examination, defense counsel asked Haque what his expectation was when Taylor accepted the gifts he had presented to her after the second counseling session. Haque responded, "I ... thought she was going to marry me and since we made up, it was more solid ... I had reasons to believe that this relationship would go on and she would marry me." Haque then testified that during the counseling session "it was agreed that we would go to [Taylor's] sister's boyfriend's birthday party." According to Haque, "it was agreed I would be introduced slowly but effectively to her family and this was a great chance, a golden opportunity because ... the family members would be there."

[¶ 11] The State called Linda Barter as a rebuttal witness. The court allowed Barter

---

1. Dr. Bloom was permitted to, and did, testify extensively regarding Haque's state of mind at the time of his attack on Taylor, as well as the role that his cultural background would play in his response to the events at issue.

to testify to what was said at the May 8 counseling session. Barter testified that the purpose of the May 8 session "was a discussion surrounding [Taylor's] wanting to end the relationship." According to Barter, "[Taylor] said she didn't want to be engaged. She did not want [Haque's] ring, and his response to that was, my parents can come over in July for the wedding."

## DR. BLOOM'S TESTIMONY

[¶ 12] Haque contends that the trial court erred in excluding Bloom's testimony that Haque was in a "blind rage" at the time of the killing. Because the excluded testimony embraces an ultimate issue, we disagree.

[¶ 13] Pursuant to M.R. Evid. 701 and 702, the trial court "may exclude opinions which state legal conclusions, beyond the specialized knowledge of the expert." *State v. Flick*, 425 A.2d 167, 171 (Me.1981). In addition, the trial court may "exclude opinions which are arguably within the expert's specialized knowledge, but which are so conclusory, or so framed in terms of the legal conclusions to be drawn, that they will not 'assist the trier of fact.'" *Id.* (citing M.R. Evid. 702). Therefore, when a medical expert in a criminal case proposes to testify as to an ultimate issue in the case—the defendant's state of mind—the trial court acts well within its discretion when it precludes the testimony. *See id.* (holding that the trial court did not abuse its discretion in excluding testimony by medical professionals that defendant "acted intentionally or knowingly ... or acted in extreme anger or fear.").

[¶ 14] One of Haque's defenses was that he was guilty of manslaughter, rather than murder, because he killed Taylor "while under the influence of extreme anger ... brought about by adequate provocation." 17-A M.R.S.A. § 203(1)(B) (1983 & Supp. 1998). Therefore, whether Haque was under the influence of extreme anger was one of the ultimate issues in this case. Testimony that Haque "went into a blind rage" at the time of the killing is not meaningfully distinguishable from an opinion that a defendant acted under the influence of "extreme anger." We, therefore, conclude that the court acted well within its exercise of discretion when it excluded testimony by Bloom that Haque went into a "blind rage." *See State v. Michaud*, 513 A.2d 842, 849 (Me.1986) (holding that the trial court did not err in excluding testimony that the defendant was "operating under extreme anger.").

## DR. CAUGHEY'S TESTIMONY

[¶ 15] Haque contends that the trial court erred in excluding Caughey's testimony on cultural transitions because the testimony would have assisted the jury in determining whether Haque had the requisite state of mind to be guilty of murder.

[¶ 16] A qualified expert may testify if his or her "specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." M.R. Evid. 702. A cultural anthropologist or other expert in cultural norms may possess "specialized knowledge" that can "assist the trier of fact." *See Dang Vang v. Vang Xiong X. Toyed*, 944 F.2d 476, 481 (9th Cir.1991) (upholding decision in civil trial to allow epidemiologist to testify about women in the Hmong culture); *see also People v. Aphaylath*, 68 N.Y.2d 945, 510 N.Y.S.2d 83, 502 N.E.2d 998, 999 (1986) (reversing order excluding expert testimony on the stress encountered by Laotian refugees). As with all expert testimony, however, the expert's opinion must be relevant. M.R. Evid. 402. Testimony is relevant when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." M.R. Evid. 401.

[¶ 17] The trial court concluded that the testimony was not relevant to any issue that was before the court. Dr. Caughey qualified as an expert in cultural anthropology, but was not qualified to, and did not, offer testimony as to Haque's state of mind. Although cultural differences may be relevant to a defendant's state of mind, Caughey's testimony was not relied on by Haque's psychiatric expert, Dr. Bloom. Moreover, Haque expressly disavowed any reliance on a cultural defense. Accordingly,

the testimony of Dr. Caughey was irrelevant to any state of mind defense. *See State v. Girmay,* 139 N.H. 292, 652 A.2d 150, 152 (1994) (testimony of expert in Ethiopian culture not relied on by defendant's psychiatric expert in murder case involving Ethiopian defendant was irrelevant and properly excluded); *see also People v. Poddar,* 26 Cal.App.3d 438, 103 Cal.Rptr. 84, 88 (1972), *rev'd on other grounds,* 10 Cal.3d 750, 111 Cal.Rptr. 910, 518 P.2d 342 (1974) (testimony relating to defendant's culture properly excluded as to issue of diminished capacity).

[¶ 18] The one issue to which Caughey's testimony would be relevant would be the defense of adequate provocation. Adequate provocation is an affirmative defense. 17–A M.R.S.A. § 201(3), which reduces murder to manslaughter, *id.* § 203(1)(B). The defendant must demonstrate (1) that he "caus[ed] the death while under the influence of extreme anger or extreme fear," which (2) was "brought about by adequate provocation." *Id.* § 201(3) & 203(1)(B). Provocation is adequate only if "[i]t is not induced by the actor," and

> [i]t is reasonable for the actor to react to the provocation with extreme anger or extreme fear, provided that evidence demonstrating only that the actor has a tendency towards extreme anger or extreme fear shall not be sufficient, in and of itself, to establish the reasonableness of his reaction. *Id.* § 201(4).

[¶ 19] "There are limits on the type of conduct that we will recognize as sufficient to engender extreme anger or fear and mitigate the conduct of the defendant." *State v. Cumming,* 634 A.2d 953, 957 (Me. 1993). For example, "mere words alone, however inflammatory or opprobrious, do not" suffice. *State v. Hilliker,* 327 A.2d 860, 865 (Me.1974). Neither will finding a note that suggests that a former wife has formed a new relationship, *Cumming,* 634 A.2d at 957, or discovering a former wife in a lounge slow dancing with a man, *Tribou v. State,* 552 A.2d 1262, 1263–65 (Me.1989).

[¶ 20] Although the determination as to "the adequacy of the provocation under sections 201 and 203 is a conclusion to be drawn by the trier of fact, . . . whether the evidence is legally sufficient to generate the defense . . . is a question of law for the determination of the court." *State v. Michaud, Jr.,* 611 A.2d 61, 63 (Me.1992). The concurrent events which Haque contends provoked his extreme anger were Taylor's refusal to marry Haque, her desire to terminate their relationship, and her statement that "we [are] just too different." As mere words that ended a romantic relationship, these events do not constitute a legally adequate provocation as a matter of law. Therefore, it was not "reasonable for [Haque] to react to the provocation with extreme anger or extreme fear." *See* 17–A M.R.S.A. § 201(4)(B). Given that the evidence was not legally sufficient to generate a defense of adequate provocation, Caughey's testimony was ultimately not relevant to any determination properly before the jury.

## LINDA BARTER'S TESTIMONY

[¶ 21] Finally, Haque contends that the trial court erred in permitting Barter to testify as to the out of court statements of Taylor and Haque because the statements were hearsay. We disagree.

[¶ 22] Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." M.R. Evid. 801(c). By definition, therefore, a statement that is not offered to prove the truth of the matter asserted is not hearsay. *State v. Tapley,* 598 A.2d 1190, 1192 (Me.1991). Because the statements of Taylor were not offered for the truth of the matter asserted but to impeach Haque's testimony, the statements were admissible. In addition, Haque's statements offered against him by the state were admissible as an admission by a party-opponent. *See* M.R. Evid. 801(d)(2).

The entry is:

Judgment affirmed.