2003 ME 108

**STATE of Maine**

v.

**Stephen LOCKHART.**

Supreme Judicial Court of Maine.

Argued: May 14, 2003.
Decided: Aug. 15, 2003.

G. Steven Rowe, Attorney General, Donald W. Macomber, Asst. Attorney General (orally), Lisa P. Marchese, Asst. Attorney General, Augusta, for State.

Peter B. Bickerman, (orally), Verrill & Dana, LLP, Augusta, for defendant.

Panel: SAUFLEY, C.J., and CLIFFORD, RUDMAN, ALEXANDER, CALKINS, and LEVY, JJ.

LEVY, J.

[¶ 1] Stephen Lockhart appeals from a judgment of conviction entered in the Superior Court (Kennebec County, *Warren, J.*) following a jury verdict finding him

guilty of murder in violation of 17–A M.R.S.A. § 201(1)(A) (1983), *amended by* 17–A M.R.S.A. § 201(1) (Supp.2002). Lockhart contends the court erred by: (1) refusing to suppress the statements he made to police; (2) allowing the State to introduce evidence of an earlier incident of domestic violence involving the same victim; (3) denying his motion for a mistrial in connection with evidence of the earlier domestic violence incident; (4) not instructing the jury on the defense of adequate provocation; (5) failing to include in its written jury instructions the court's oral instruction on the State's burden of proof beyond a reasonable doubt; (6) admitting autopsy photographs of the victim; and (7) permitting repeated instances of prosecutorial misconduct. We disagree and affirm the judgment.

## I. CASE HISTORY

[¶ 2] Andrea and Stephen Lockhart married in 1991 and had three children. On April 18, 1997, Andrea sought medical help at a hospital twelve hours after receiving a laceration above her left eyelid. She told the emergency room physician assistant on duty that her husband kicked in the front door the previous night and that the door struck her face. Andrea and Lockhart separated in September 1998. Andrea and the children moved into a home in Lamoine, and Lockhart moved into a rented apartment above the workshop of his employer, a boatyard in Southwest Harbor.

[¶ 3] On Friday, December 11, 1998, Andrea called Lockhart at the boatyard to see if he could take care of their oldest child, who was sick, because Andrea was scheduled to work that evening, and Lockhart agreed. Around 3:45 p.m., Andrea arrived at the boatyard with the sick child and settled him into the apartment. Lockhart accompanied Andrea downstairs and into the boatyard workshop. There, they got into a heated argument about the children's Christmas Day plans, the Department of Human Services' recent involvement in the collection of child support payments from Lockhart, and the role of Andrea's new boyfriend in her and the children's lives.

[¶ 4] The argument escalated into a physical altercation during which Lockhart attempted to strangle Andrea by grabbing her neck with both of his hands. He then struck her with a twenty-one-inch-long wedge-shaped block of wood, knocking her to the concrete floor. While she lay on the floor, Lockhart hit Andrea on top of the head with the block of wood, causing multiple skull fractures and brain hemorrhage. The medical examiner subsequently determined that while the strangulation and the blow to the top of Andrea's head each could have been fatal, Andrea died from the blunt impact head injury, with the injuries from strangulation being a contributing factor.

[¶ 5] Lockhart wrapped Andrea's bleeding head with duct tape, put the body into Andrea's van, and drove the van to the last bay in the workshop. He prepared a seven-foot-long box by fiberglassing the sides and bottom, moved the body out of the van and placed it in the box, and sealed the top of the box with more fiberglass. Lockhart returned upstairs to the apartment and made supper for his son.

[¶ 6] When Andrea failed to show up at work, Andrea's sister and boyfriend each called the police twice. Officer Murphy was dispatched from the Southwest Harbor Police Station to the boatyard several times to look for Andrea and her silver van. When he drove around the boatyard, he did not see a woman or a silver van. Andrea's sister and her husband also stopped by Lockhart's apartment to ask about Andrea's whereabouts. Lockhart calmly responded that Andrea had only

been at the boatyard long enough to drop off the sick child, and the sister said that she intended to inform the police that Andrea was missing.

[¶ 7] After his visitors left and the child fell asleep, Lockhart ran and walked the two miles to the police station. When Officer Murphy approached Lockhart around 9:45 p.m. in the station, Lockhart cried out, "I killed her, I killed her, I killed her." Officer Murphy asked Lockhart to come into the officers' room and sit down. Officer Murphy asked, "Are you Stephen Lockhart?" Lockhart said that he was, and Officer Murphy asked, "Where is Andrea?" Lockhart responded that she was at the boatyard. Officer Murphy then told Lockhart he needed to know exactly where she was because she may need help and asked him exactly where Andrea was. Lockhart responded that she was in the last bay with her van. During the twenty minutes that Officer Murphy was with Lockhart, Lockhart was alternating between "uncontrollably shaking and screaming" and "just sobbing."

[¶ 8] Shortly after Chief of Police Tims and Officer Lovejoy arrived at the station, Officer Murphy and Chief Tims drove to the boatyard, while Officer Lovejoy stayed with Lockhart at the station. Officer Lovejoy accompanied Lockhart outdoors when he wished to smoke a cigarette. While outdoors, Lockhart asked Officer Lovejoy to shoot him. During this period, Lockhart was not physically restrained and he appeared to Officer Lovejoy to be at the point of shock, shaking at times and crying at other times. After Chief Tims and Officer Murphy found a large fiberglass box in the last bay at the boatyard, Chief Tims returned to the police station and told Lockhart that they had found Andrea's van and a red fiberglass box, but not Andrea. Chief Tims asked Lockhart, "Is she in there?" Lockhart answered affirmatively. Chief Tims called the State Police and returned to the scene, and Officer Lovejoy stayed with Lockhart. Chief Tims and Officer Murphy cut open the fiberglass box and found Andrea's body.

[¶ 9] Maine State Police Detective Stephen Pickering arrived at the station, and at 11:41 p.m. read Lockhart his *Miranda* rights for the first time. After Lockhart demonstrated his understanding of each of the five rights, the detective asked: "Now, having all those rights which I just explained to you in mind, do you wish to answer questions at this time?" Lockhart answered, "Please, if I can." Throughout the interrogation, the detective spoke quietly and calmly. Lockhart sobbed as he answered Detective Pickering's questions in a responsive manner. Lockhart's answers included the following statements: "I don't know," "I can't do this," "I can't, don't ask, don't," and "I want to go to sleep." Midway into the interview, Lockhart complained that his head hurt, stated that he wanted to die, and said that his hand had a cramp. When he complained for the second time about his head hurting, Detective Pickering tried without success to get him some aspirin. Around midnight Lockhart said that he wanted to go to the hospital and the detective then ended the interview, placed Lockhart under arrest, handcuffed him, and drove him to the local hospital.

[¶ 10] At the hospital, a doctor gave Lockhart a low to medium dose of Ativan, a tranquilizer, which relaxed him within fifteen minutes. While Ativan can cause people to be less inhibited, the doctor saw no signs of euphoria in Lockhart after the ingestion and instead observed Lockhart become less nervous, less agitated, and quieter. After receiving a CAT scan, Lockhart heard the CAT scan technician, an acquaintance of the detective, tell the detective that he was surprised when he

met his current fiancée because he thought he hated all women. Lockhart smiled at Detective Pickering and said, "I guess he doesn't know what I'm here for." After the hospital examination, the detective transported Lockhart to the Hancock County Jail.

[¶ 11] On the afternoon of December 12, 1998, Detective Pickering met with Lockhart at the Hancock County Jail. Before the taping began, Lockhart told the detective, "It's very obvious I did this, I will readily admit to that, but should I talk to a lawyer?"[1] The detective responded that he could not make that decision, but he would read Lockhart the *Miranda* rights again and Lockhart could decide. As Detective Pickering read each of the *Miranda* rights out loud, Lockhart demonstrated his understanding of the rights by rephrasing them in his own words. Detective Pickering then asked Lockhart, "Now, having all those rights which I just explained to you in mind, do you wish to answer questions at this time?" Lockhart answered, "I will try to." During the interview, Lockhart admitted that he had first struck Andrea with the wedge-shaped block of wood while she was standing, struck her a second time while she was on the floor, wrapped her head with duct tape, prepared a wooden box by encasing it with fiberglass, put her body in the box, and covered the top of the box with fiberglass, entombing her body.

[¶ 12] On February 16, 1999, Lockhart was indicted for intentionally or knowingly causing the death of Andrea in violation of 17–A M.R.S.A. § 201(1)(A). Lockhart subsequently filed a motion to suppress all statements made by him concerning the murder. After a two-day hearing, the Superior Court (Hancock County, *Mead, J.*)

denied the motion, concluding that no violation of the requirements of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), had occurred and that "all of Defendant's statements were the result of the exercise of his free will and intellect." Venue for the trial was ordered transferred to Kennebec County.

[¶ 13] In October 2001, the jury trial began with the State presenting its theory of murder, and the defense presenting its theory of manslaughter. Shortly before the parties made their closing statements, the court stated that it understood the defense was not requesting a jury instruction on the affirmative defense of adequate provocation. Defense counsel agreed, consulted with Lockhart and co-counsel, and informed the court that the defense did indeed waive the instruction as to adequate provocation. The court included in its spoken jury instructions an explanation of the State's burden of proof beyond a reasonable doubt. The court also provided the jury written instructions repeating the court's verbal instructions regarding the elements of murder and manslaughter, and how the elements of knowledge and intent may be inferred. The written instructions did not repeat the court's verbal instruction regarding the State's burden of proof beyond a reasonable doubt. Lockhart did not object to the absence of an explanation of the State's burden of proof beyond a reasonable doubt in the proposed written instructions discussed by counsel with the court in chambers, after the closing statements, or after the oral instructions were delivered.

[¶ 14] After the jury returned a verdict of guilty of murder, the Superior Court (Kennebec County, *Warren, J.*) sentenced

---

1. Detective Pickering testified at the motion hearing that he wrote Lockhart's comment down verbatim.

Lockhart to a term of forty-seven years. Lockhart appeals his conviction.

## II. DISCUSSION

### A. The Administration of *Miranda* Rights and Lockhart's Waivers

[¶ 15] Lockhart contends that the motion court erred in denying his motion to suppress the December 11 and 12 statements that he made to various officers. A court's denial of a motion to suppress is reviewed in two different ways: the factual findings made by the trial court for clear error, and de novo for issues of law and for the ultimate determination of whether the statement should be suppressed. *State v. Higgins*, 2002 ME 77, ¶ 13, 796 A.2d 50, 55; *State v. Forsyth*, 2002 ME 75, ¶ 9, 795 A.2d 66, 69. "A person subject to interrogation while in police custody must first be given a *Miranda* warning, otherwise statements made in the course of the interrogation will not be admissible against that person." *State v. Holloway*, 2000 ME 172, ¶ 13, 760 A.2d 223, 228.

### 1. Statements Made at the Southwest Harbor Police Station Prior to the *Miranda* Warnings

[¶ 16] Lockhart contends that the Superior Court erred by failing to suppress the statements he made in response to the officers' four questions prior to being administered the *Miranda* warnings at the Southwest Harbor Police Station.[2] Lockhart arrived at the police station on his own initiative around 9:45 p.m. in a hysterical state, repeatedly saying that he thought he had killed his wife and that he had killed her. During the next two hours, before Detective Pickering arrived at the station and administered *Miranda*

warnings, the officers asked Lockhart four questions.

[¶ 17] Lockhart asserts that because an armed police officer was with him at all times and he was not free to leave during the two-hour period of time in question, the interrogation was custodial and he should have been administered *Miranda* warnings. The State responds that because Lockhart voluntarily went to the police station and knew that he was free to leave, he was not in custody. In support of the questioning not being custodial, the State points out that only four questions were asked over the two-hour period, three of which pertained to Andrea's whereabouts. A suspect who is not formally arrested is subjected to a custodial interrogation if the suspect's freedom of movement has been restrained "to the degree associated with a formal arrest." *Higgins*, 2002 ME 77, ¶ 12, 796 A.2d at 54 (internal quotations omitted).

[¶ 18] We do not reach the question of whether Lockhart was subjected to a custodial interrogation during the initial period at the police station because the four questions Lockhart was asked fall within the administrative and public safety questions exceptions to *Miranda*. Whether a suspect is in custody or not, an officer is permitted to ask questions "to identify the suspect, check [his or] her identification and resolve any health or safety concerns regarding the suspect or others." *State v. Griffin*, 2003 ME 13, ¶ 9, 814 A.2d 1003, 1005; *State v. White*, 619 A.2d 92, 94 (Me.1993) (stating that the trial court's decision that "to the extent the police sought information on the location of the victim, [the suspect's] statements were within the public safety exception" was not clearly erroneous). When a statement at

---

2. Lockhart does not claim that his initial, spontaneous statements that he had killed his

wife were the product of custodial interrogation in violation of *Miranda*.

issue is "made in response to a question designed to learn something more than biographical data, some other justification for the question leading to [the suspect's statement] must be identified." *Griffin,* 2003 ME 13, ¶ 10, 814 A.2d at 1005.

[¶ 19] Here, the first question Lockhart was asked by Officer Murphy was for the purpose of learning his identity. The second and third questions asked by Officer Murphy and the fourth question asked by Chief Tims were for the purpose of determining the whereabouts and welfare of Andrea. Because Andrea had previously been reported missing by her sister and Andrea's boyfriend, the police were justified in asking Lockhart questions specifically intended to assist them in locating her. We conclude that the court did not err by refusing to suppress Lockhart's responses to these four questions.

2. Statements Made at the Southwest Harbor Police Station Following the Administration of *Miranda* Rights

▮ [¶ 20] Lockhart contends the court should have suppressed the statements that he made to Detective Pickering at the Southwest Harbor Police Station on December 11 after being read his *Miranda* rights because he was too hysterical, too unstable, and in too much pain at that time to be capable of knowingly, intelligently, and voluntarily waiving his right to counsel and his right to remain silent. In addition, Lockhart contends that Detective Pickering ignored his statements that he did not want to be questioned and did not want to talk. The State responds that Lockhart did not invoke his right to remain silent and that his distraught state and headache during the interrogation do not compel a finding that he acted involuntarily in waiving his rights.

▮ [¶ 21] Although the suppression court's factual findings are reviewed for clear error, the issue of whether rights under *Miranda* have been knowingly and intelligently waived is reviewed de novo. *State v. Coombs,* 1998 ME 1, ¶¶ 13, 15, 704 A.2d 387, 391–92. "The State bears the burden of establishing a knowing, intelligent, and voluntary waiver of *Miranda* rights by a preponderance of the evidence." *Id.* ¶ 15, 704 A.2d at 392. In order for a warned person to assert his or her right to terminate the interrogation, the person must sufficiently and clearly articulate a desire to terminate the interrogation so that " 'a reasonable police officer in the circumstances would understand the statement' to be a retraction of a waiver and a reassertion of the right to remain silent." *State v. King,* 1998 ME 60, ¶ 9, 708 A.2d 1014, 1017 (quoting *Davis v. United States,* 512 U.S. 452, 459, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994)). While an individual need not explicitly waive his or her *Miranda* rights, his or her conduct must demonstrate an intentional relinquishment or abandonment of known rights. *Coombs,* 1998 ME 1, ¶¶ 6, 15–16, 704 A.2d at 389, 392 (affirming the court's conclusion that the suspect made a knowing, intelligent, and voluntary waiver of her *Miranda* rights even though she was crying because the suspect stated that she understood her rights, did not request counsel, and told the officer that she was willing to answer any questions).

▮ [¶ 22] Lockhart's responses to Detective Pickering's questions demonstrated that he understood each of the five *Miranda* rights. When the detective asked, "Now having all those rights which I just explained to you in mind, do you wish to answer questions at this time?" Lockhart responded, "Please, if I can." Although Lockhart sobbed, made a variety of noises, and, at times, appeared to be hysterical and distraught during the interrogation, he nevertheless answered Detective Pickering's questions in a responsive, un-

derstandable, and seemingly intelligent manner. An individual's intermittent demonstration of hysteria does not automatically render any statements he or she makes involuntary, particularly when, as here, there is no indication that hysteria was exhibited during the times Lockhart made specific statements which he seeks to suppress.

[¶ 23] While several of Lockhart's responses to Detective Pickering's questions—for example, "I don't know," "I can't do this," "I can't, don't ask, don't," and "I want to go to sleep"—could be interpreted as suggesting a desire to terminate the interrogation, they were made in direct response to Pickering's questions and are reasonably understood to express Lockhart's internal conflict and pain in being asked to recount what had happened. Once Lockhart asked for medical assistance, Detective Pickering immediately terminated the interrogation and transported him to the hospital.

[¶ 24] Accordingly, the motion court did not err in concluding that Lockhart's waiver of his *Miranda* rights was made knowingly, intelligently and voluntarily and that he failed to articulate a clear desire to discontinue the interrogation.

### 3. Statement Made at the Hospital

[¶ 25] At the hospital, Lockhart stated to Detective Pickering "I guess he doesn't know what I'm here for," in response to a CAT scan technician's comment to Detective Pickering that at one time the technician hated all women. Lockhart contends that the court should have suppressed this unsolicited remark

because he had not been re-read his *Miranda* rights following the conclusion of the interrogation at the police station. Because Lockhart's statement was made neither in response to a question from an officer, nor during an interrogation, it is not the product of custodial interrogation. Thus, the re-administration of *Miranda* was not required as a predicate to the subsequent admission of the statement at trial.

### 4. Statements Made at the Hancock County Jail

[¶ 26] Lockhart contends that the court should have suppressed the statements he made to Detective Pickering on the afternoon of December 12 at the Hancock County Jail because the detective failed to terminate his questioning once Lockhart invoked, albeit ambiguously, his right to counsel before the administration of the *Miranda* warnings.[3] The State responds that Lockhart's right to counsel was fully satisfied when Detective Pickering first told him that it was up to him to decide whether to answer questions before speaking with a lawyer and then reinformed Lockhart of his right to counsel.

[¶ 27] When an individual has not yet made a valid waiver of the *Miranda* rights and invokes, even ambiguously, the right to remain silent or the right to an attorney, he or she has invoked the *Miranda* rights. *Holloway,* 2000 ME 172, ¶¶ 7, 12, 760 A.2d at 226, 228 (vacating the murder conviction because two detectives improperly continued to question an unwarned suspect after he repeatedly stated that he had said everything he had to say,

**3.** Lockhart also contends that the statements he made during the December 12 afternoon interrogation at the Hancock County Jail should be suppressed because they were tainted by the previous *Miranda* violations and the involuntary nature of his previous statements. When a confession is given, evidence is dis-

covered, or witnesses are found as a result of a Fourth Amendment violation, such fruits of an illegal search must be excluded. *State v. Smith,* 675 A.2d 93, 97 (Me.1996). Because we conclude that no constitutional violations occurred, we do not separately consider Lockhart's fruit-of-the-poisonous-tree argument.

refused to answer some of their questions, and asked to end the interrogation so he could contact an attorney).

[¶ 28] Detective Pickering testified that prior to administering the *Miranda* warnings at the jail, Lockhart stated that he would admit to what he did, and asked if the detective thought Lockhart needed a lawyer. The detective responded that he could not make that decision for Lockhart and instead would read him his *Miranda* rights again, and Lockhart could decide. Unlike the officers' response in *Holloway* of ignoring an unwarned suspect's numerous requests, Detective Pickering properly responded that he could not decide whether Lockhart needed a lawyer, and then administered the *Miranda* warnings and asked Lockhart to demonstrate his understanding of each right. Pickering then asked Lockhart: "Now, having all those rights which I just explained to you in mind, do you wish to answer questions at this time?" and Lockhart answered: "I will try to." Lockhart's question as to whether Detective Pickering thought he needed a lawyer was just that, a question, and the detective properly answered it. Neither the question, nor the exchange between the detective and Lockhart that followed, served to invoke Lockhart's right to an attorney.

B. Voluntariness of Lockhart's Statements

■ [¶ 29] Lockhart also contends that the Superior Court should have granted his motion to suppress because his confessions at the police station, hospital, and county jail were involuntary. "Whether a confession is voluntary is primarily a question of fact, ... [and] we review the suppression judge's resolution of factual issues deferentially under the clear error standard." *Coombs*, 1998 ME 1, ¶ 7, 704 A.2d at 389–90. However, the application of

legal principles to the factual findings is reviewed de novo. *Id.* ¶ 8, 704 A.2d at 390. "A voluntary statement is one that 'is the result of defendant's exercise of his [or her] own free will and rational intellect,' as opposed to one that results from 'threats, promises or inducements made to the defendant.'" *State v. McCarthy*, 2003 ME 40, ¶ 12, 819 A.2d 335, 340 (quoting *State v. Sawyer*, 2001 ME 88, ¶¶ 8–9, 772 A.2d 1173, 1175–76).

■ [¶ 30] The State has the burden of proving beyond a reasonable doubt that the confession and statements were voluntarily made. *McCarthy*, 2003 ME 40, ¶ 12, 819 A.2d at 340. "The suppression judge must consider the totality of the circumstances in determining whether a confession is voluntary...." *Coombs*, 1998 ME 1, ¶ 7, 704 A.2d at 389. The following factors are considered when analyzing the totality of the circumstances surrounding a confession: "the details of the interrogation; duration of the interrogation; location of the interrogation; whether the interrogation was custodial; the recitation of *Miranda* warnings; the number of officers involved; the persistence of the officers; police trickery; threats, promises or inducements made to the defendant; and the defendant's age, physical and mental health, emotional stability, and conduct." *Sawyer*, 2001 ME 88, ¶ 9, 772 A.2d at 1176.

1. Statements Made at the Southwest Harbor Police Station

■ [¶ 31] Lockhart contends that he was too emotionally hysterical and too physically upset that evening to be able to make statements of his own free will and rational intellect. However, application of the *Sawyer* factors to the statements Lockhart made before he was administered *Miranda* reveal the following: Lockhart initiated contact with the officers by coming voluntarily to the station; without

any questioning, he repeatedly stated that he had killed or thought he had killed Andrea; the almost two-hour waiting period involved only four questions from officers, three of which were about Andrea's whereabouts; while there were three officers involved, no more than one was with Lockhart at a time; there have been no allegations or signs of any trickery, threats, promises, or inducements; Lockhart was thirty-four years old; and he was, at times, visibly hysterical and uncontrollably shaking. Although Lockhart was intermittently hysterical, the Superior Court did not err in concluding that his statements were voluntary because he demonstrated free will and rational thought by initiating the contact with the police, responding appropriately to the handful of questions asked of him, and waiting over a period in excess of two hours without major incident while the police sought to determine Andrea's whereabouts.

[¶ 32] Application of the *Sawyer* factors to the statements Lockhart made after the administration of a *Miranda* warning reveal the following: throughout the custodial interrogation at the station, the detective spoke in a calm, unthreatening tone; the interrogation lasted about twenty minutes; the detective recited the *Miranda* warnings and Lockhart demonstrated his understanding by stating the rights in his own words; the one officer who was involved did not persist in asking questions that Lockhart did not want to answer and, instead, reassured him that it was okay when he did not want to answer questions; there are no allegations or signs of any police trickery, threats, promises, or inducements; and Lockhart rocked and sobbed and moaned during the interrogation. Although Lockhart was quite upset during this interrogation, he was responsive to some of the detective's questions and chose not to answer other questions, demonstrating the exercise of his own free will and rational intellect.

### 2. Statement Made at the Hospital

[¶ 33] Lockhart contends that his off-hand remark to Detective Pickering at the Maine Coast Memorial Hospital was involuntary and should have been suppressed because he was under the influence of Ativan, a mood-altering drug. The State responds that Lockhart's remark was voluntary because he had received only a low to medium dose of Ativan, and there is no indication that the dose turned Lockhart into someone who was "chatty and euphoric." The fact that an individual is mildly sedated does not, standing alone, establish that any statement he or she makes is no longer the product of a free will and rational intellect. *State v. Bleyl*, 435 A.2d 1349, 1360–61 (Me.1981). The Superior Court did not err in concluding that Lockhart's ingestion of Ativan did not affect his ability to make voluntary statements.

### C. April 1997 Domestic Violence Incident Evidence

[¶ 34] Lockhart contends that the evidence involving the April 1997 incident should not have been admitted because the danger of unfair prejudice far outweighed its probative value. The State responds that because Lockhart stipulated that the evidence could be presented, he waived any objection.

[¶ 35] We review unpreserved alleged trial errors that affect substantial rights for obvious error. *State v. Thomes*, 1997 ME 146, ¶ 7, 697 A.2d 1262, 1264. Although M.R. Evid. 404(b) provides that " '[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith,' " evidence of such acts is admissible when

offered to prove, among other things, motive, intent, or absence of accident. *State v. Huntley*, 681 A.2d 10, 13 (Me.1996) (quoting M.R. Evid. 404(b)). "The probative value of the evidence must not be substantially outweighed by any prejudicial effect pursuant to Rule 403." *State v. Krieger*, 2002 ME 139, ¶ 8, 803 A.2d 1026, 1029 (reviewing cases where evidence of previous uncharged acts was admissible to establish whether a defendant's actions were intentional instead of accidental, or the nature of a relationship).

[¶ 36] Here, Lockhart and the State stipulated that an emergency room physician assistant could testify to the following: in April 1997, Andrea stated that Lockhart kicked the door open, causing the door to hit her over her left eyebrow; and that Andrea was referred to counseling services. As part of the stipulation, the State agreed to not have the physician assistant testify that Andrea told him the reason she waited a day before seeking treatment was that she felt threatened by Lockhart who had told her he would kill her if she did so. Lockhart did not object to any of the testimony by the physician assistant, two other witnesses, and Lockhart himself, regarding the general description of the April 1997 incident and injury.

■ [¶ 37] At trial, the prosecution claimed that the killing of Andrea was intentional. The testimony that Lockhart had previously engaged in an act of domestic violence toward Andrea by kicking in the locked front door of their home causing the door to strike her in the head, was offered to prove the absence of mistake or accident as to the murder and is, therefore, admissible under Rule 404(b). Further, the trial court acted within its discretion in applying Rule 403 and concluding that this evidence was not so prejudicial as to substantially outweigh its probative value.

### D. Lockhart's Motion for a Mistrial

■ [¶ 38] Prior to the emergency room physician assistant testifying, the State and Lockhart stipulated with the court's approval that the physician assistant would limit his testimony to "his statement that Andrea told him her husband kicked the door and it flew in and hit her over the left eyebrow." However, when the Assistant Attorney General asked the physician assistant why Andrea had come to the emergency room for treatment, he responded: "She was there because she stated she had been assaulted by her husband . . . ." The court promptly instructed the jury to disregard the word "assault." At sidebar, Lockhart moved for a mistrial on the ground that the physician assistant's testimony violated the stipulation and was so prejudicial that no curative instruction could adequately remedy it. The court denied the motion and again instructed the jury to disregard the testimony. Further, once subject to cross examination, the physician assistant testified that he had no recollection as to whether Andrea had used the word "assault" in describing the incident. Following the completion of the physician assistant's trial testimony, the court again issued a second curative instruction, directing the jury to disregard his characterization in response to the prosecutor's first set of questions and to focus instead on the words Andrea actually said, as established by the evidence.

■ [¶ 39] Whether to grant or deny a motion for a mistrial is left " 'to the sound discretion of the trial court.' " *State v. Melanson*, 2002 ME 145, ¶ 11, 804 A.2d 394, 398 (quoting *State v. DePhilippo*, 628 A.2d 1057, 1058 (Me.1993)). "[T]he trial court's determination of whether exposure to potentially prejudicial extraneous evidence would incurably taint the jury ver-

dict or whether a curative instruction would adequately protect against consideration of the matter stands unless clearly erroneous." *State v. Ardolino,* 1997 ME 141 ¶ 18, 697 A.2d 73, 79. Here, the extraneous evidence was generated by a non-responsive answer to the prosecutor's question and was neither a product of bad faith nor of prosecutorial misconduct. The trial court concluded that the "assault" testimony would not prejudice Lockhart so long as the jury focused on what Andrea "actually said." The court's curative instructions accomplished this result, and we perceive little or no prejudice resulting from the physician assistant's initial unresponsive answer.

E.   Jury Instructions

1.   Affirmative Defense of Adequate Provocation

■ [¶ 40] Lockhart contends that although defense counsel did not seek an instruction as to the affirmative defense of adequate provocation, it was obvious error for the court to fail to sua sponte give such an instruction because adequate provocation was a reasonable hypothesis for the jury to consider. Lockhart states that there was ample evidence in the record to support a jury conclusion that his actions were taken under the influence of extreme anger brought on by adequate provocation. The State responds that because Lockhart waived the instruction and did not establish the affirmative defense of adequate provocation beyond a preponderance of the evidence, he is barred from raising the issue on appeal.

[¶ 41] "It is an affirmative defense to a prosecution under [the murder subsection] that the person causes the death while under the influence of extreme anger or extreme fear brought about by adequate provocation." 17–A M.R.S.A. § 201(3) (Supp.2002). Section 201(4) provides that:

[P]rovocation is adequate if:

A.   It is not induced by the person; and

B.   It is reasonable for the person to react to the provocation with extreme anger or extreme fear, provided that evidence demonstrating only that the person has a tendency towards extreme anger or extreme fear is not sufficient, in and of itself, to establish the reasonableness of the person's reaction.

17–A M.R.S.A. § 201(4) (Supp.2002); *see also State v. Haque,* 1999 ME 30, ¶¶ 19–20, 726 A.2d 205, 209 (listing the following examples of conduct as being insufficient to give rise to the defense of adequate provocation: the hearing of mere words regardless of how hurtful or inflammatory, the finding of a note that suggests an ex-spouse is in a new relationship, or the discovery of an ex-spouse slow dancing with someone else).

■ [¶ 42] The court stated that it understood that Lockhart was not requesting a jury instruction on the affirmative defense of adequate provocation. Defense counsel agreed, consulted with his client, and informed the court that they indeed did waive the instruction as to adequate provocation. Because Lockhart affirmatively waived an instruction on the affirmative defense of adequate provocation, our review is limited to obvious error. *See* 17–A M.R.S.A. § 101(1) (Supp.2002). Even if Lockhart had not affirmatively waived this issue, the issue is not generated by the trial evidence because Lockhart's testimony about the heated argument, slapping, and hitting is insufficient to establish that the provocation was adequate. First, Lockhart failed to produce evidence demonstrating that he did not induce the provocation. Second, he did not demonstrate that it was reasonable for him to react to Andrea's conduct with extreme anger. The trial court did not commit error, and

certainly not obvious error, when it did not instruct the jury regarding the affirmative defense of adequate provocation.

## 2. Written Instructions

[¶ 43] Lockhart contends that because the court's written jury instructions included an explanation of how to infer "intentional and knowing conduct" but failed to restate the "State's burden of proof beyond a reasonable doubt," the written instructions unfairly emphasized the duty of the jury to infer the presence of intentional or knowing conduct from surrounding circumstances, with the consequence of prejudicially favoring the State over the defendant. The State responds that because Lockhart did not object to the instructions before they were delivered to the jury, he waived any objection and should be barred from raising this issue on appeal.

■ [¶ 44] The court may choose to "provide written instructions to the jury covering all or a part of what is orally provided." M.R.Crim. P. 30(b). "Before written instructions are provided to the jury, the parties should be given the opportunity to review the instructions, suggest alterations, object to the language of the instructions, and, if necessary, preserve those objections." *State v. Knox*, 2003 ME 39, ¶ 6, 819 A.2d 1011, 1013. Here, defense counsel did not object to the absence of an explanation of the State's proof beyond a reasonable doubt in the proposed written instructions when they were discussed by counsel and the judge in chambers, after closing arguments, and after the oral instructions were delivered. Because Lockhart failed to object to the instructions, they are reviewed for obvious

error. There is no obvious error because the spoken instructions correctly explained the jury's task with respect to the State's proof beyond a reasonable doubt. Considering the spoken and written instructions as a whole, the trial court did not err by failing to repeat its spoken reasonable doubt instruction in its written instructions.[4]

## F. Admission of Photographs of the Victim

■ [¶ 45] Lockhart claims that the trial court abused its discretion under M.R. Evid. 403 by admitting autopsy photographs depicting Andrea's neck and head.

■ [¶ 46] A gruesome photograph of a victim's body may be admitted provided that its probative value outweighs the danger of unfair prejudice. *State v. Irving*, 2003 ME 31, ¶ 23, 818 A.2d 204, 210. "The critical factor in this balancing test is the significance of the photograph in proving the State's case." *State v. Conner*, 434 A.2d 509, 512 (Me.1981). Lockhart is correct in his characterization that the photographs are gruesome. They were, however, of substantial probative value because they illustrated the medical examiner's explanation of the significance of the differences in the color of several marks left on Andrea's neck. This evidence was central to the State's theory that Lockhart acted intentionally, not recklessly, because the photographs helped establish first, that he attempted to strangle his victim in addition to striking her head, and second, that by completely covering her nose and mouth with duct tape, he assured that his victim could not breathe. The trial judge took steps to mitigate the prejudicial effect of

---

4. While we discern no obvious error, consideration should be given to including a *reasonable doubt instruction in any written* instruction that includes an inference instruction because of the primacy of the reasonable doubt standard in criminal proceedings.

the photographs by restricting the placement of the enlargements of the photographs to the center of the courtroom, so as not to be directly in front of the jury. In addition, the trial judge directed the prosecutor to substitute smaller photographs for the enlargements to be used by the jury during its deliberations. The court acted within its discretion in admitting the photographs and in taking prophylactic steps in connection with them.

## G. Prosecutorial Misconduct

[¶ 47] Lockhart asserts that his judgment should be vacated due to repeated instances of prosecutorial misconduct. He complains that in both her opening statement and closing arguments the Assistant Attorney General repeatedly mischaracterized Lockhart's defense theory of manslaughter, by arguing that Andrea's death was not an "accident." Lockhart thus contends that the prosecutor inappropriately "condition[ed] the jury that its 'choice' was between finding [Lockhart] guilty of murder or finding that Andrea's death was just an 'accident.' " Because the claim of prosecutorial misconduct was not raised before the trial court, we review the claim for obvious error.

[¶ 48] It is a "well-established rule that the prosecutor has a responsibility to help ensure a fair trial, and although permitted to strike hard blows, may not strike foul ones." *State v. Hebert,* 480 A.2d 742,

750 (Me.1984). "The central question is whether the [prosecutor's] comment is fairly based on the facts in evidence." *State v. Pendexter,* 495 A.2d 1241, 1241 (Me.1985); *see also* M. Bar R. 3.7(e)(2)(v) ("[A] lawyer may argue, on the lawyer's analysis of the evidence, for any position or conclusion with respect to the matters stated therein.").

[¶ 49] Although the theory of Lockhart's defense was that he acted recklessly and was therefore guilty of manslaughter but not murder, Lockhart testified at trial that he wrote two letters to different people stating that while he was responsible for Andrea's death, her death was an accident. Lockhart's attempt to minimize his culpability by characterizing the death as an accident was before the jury. It was not misconduct for the prosecutor, therefore, to address that fact in her opening jury statement or to argue that fact in her closing. We do not separately address Lockhart's remaining claims of prosecutorial misconduct, which we conclude are without merit.

The entry is:

Judgment affirmed.