STATE OF MAINE                    SUPERIOR COURT
PENOBSCOT, SS.                    Docket No. CR-05-949

State of Maine

                                 ┌─────────────────────────┐
                                 │   FILED & ENTERED        │
                                 │   SUPERIOR COURT         │
                                 │     JUN 22 2006          │
    v.          Order (Motion to Suppress) │ PENOBSCOT COUNTY │
                                 └─────────────────────────┘

Matthew L. Williams


On April 6, 2006, hearing was held on the defendant's motion to suppress statements he made to police officers who were investigating injuries sustained by his son. At the motion hearing, the defendant was present with counsel. The sole challenge raised by the defendant to the admissibility of his statements is based on his contention that he did not make those statements voluntarily.

In this context, the state must establish beyond a reasonable doubt that the defendant's statements were made voluntarily. *State v. Sawyer*, 2001 ME 88, ¶ 7, 772 A.2d 1173, 1175. A statement is voluntary if it results from the "defendant's exercise of his own free will and rational intellect," rather than from "threats, promises or inducements made to the defendant." *State v. Lockhart*, 2003 ME 108, ¶ 29, 830 A.2d 433, 444. A source of involuntariness may be external, such as a threat, promise or inducement made to the defendant. *See id.*, ¶ 29, 830 A.2d at 444. A statement also may be involuntary due to circumstances internal to the defendant, irrespective of any coercive or otherwise improper conduct of an interviewing police officer. *See State v. Rees*, 2000 ME 55, 748 A.2d 976. The question of voluntariness is answered by considering the totality of the circumstances, including "the details of the interrogation; duration of the interrogation; location of the interrogation; whether the interrogation was custodial; the recitation of *Miranda* warnings; the number of officers involved; the persistence of the officers; police trickery; threats, promises or inducements made to the defendant; and the defendant's age, physical and mental health, emotional stability, and conduct." *Sawyer*, 2001 ME 88, ¶ 9, 772 A.2d at 1176.


1

At the suppression hearing, the defendant challenged the admissibility of all statements he made to the police. The hearing record revealed that there were five such statements, the middle three of which were recorded. Bangor Police Detective Beaulieu was involved in each of these interviews of the defendant. Detective Cotton was present for three of them. The court concludes that the state has established beyond a reasonable doubt the voluntariness of each of the five statements.

The defendant made the first two sets of statements to Beaulieu on September 30, 2005, at Eastern Maine Medical Center, where the defendant's son had been taken for medical treatment arising from neurological injuries suggestive of shaken baby syndrome. The first conversation between the defendant and Beaulieu, which occurred at approximately 5:00 a.m., appears to have been very brief and without much substance. The defendant expressed concern about his son's condition and told Beaulieu that he (the defendant) was glad that Beaulieu had come to the hospital. (The two knew each other from a prior contact, which involved a criminal investigation but which did not lead to a difficult relationship between the two.) The evidence concerning the circumstances of this first encounter at the hospital does not suggest anything other than the defendant's willing participation in it.

Toward the end of the morning on the same day, Beaulieu and Cotton approached the defendant to talk with him about the circumstances of his son's injuries. The interview lasted roughly 40 minutes. At the outset, Beaulieu told the defendant the reason why he and Cotton wanted to talk with him, and Beaulieu assured the defendant that he was not under arrest and would not be arrested. The court notes initially that this comment did not render the defendant's subsequent statements to be involuntary as the result of an improper inducement. Rather, the evident purpose – and the actual effect – of that comment was to dispel any impression that the defendant was in custody. In fact, the defendant does not contend here that he was in custody during this interview or during any of the other interviews, and the non-custodial character of each contact weighs in favor of the defendant's voluntary participation in them. Beaulieu's statement, which he reiterated at the beginning of the next interview, which occurred on October 3, was truthful: the defendant was not arrested during the interview, and the defendant was free to go after the interviews were completed. Beyond this, this initial comment by Beaulieu

cannot be reasonably construed as a promise of immunity or permanent protection from arrest.

A review of the audio recording of the interview reveals that, throughout the conversation, the defendant was responsive, coherent and fully in control of his mental faculties. The little amount of emotion he displayed does not approach any indication that he had lost the ability to act freely. The officers' conduct toward the defendant was not heavy-handed or coercive. They spoke to him in calm and even tones, expressing empathy for the pressures that can be experienced by the parents of infants. Although they repeatedly pressed the defendant to tell the truth in order to assist his son's medical providers, the nature of the officers' questions and statements directed to the defendant cannot be seen to have overcome the defendant's ability to decide whether or not to participate in that conversation.

The legal quality of this interview and the subsequent ones must also be measured by a comment that the defendant made near the beginning of the conversation he had with the officers on October 4 (which is the third of the recorded statements). There, the defendant told the officers that he and his wife *wanted* to talk to them, because they believed that they (the officers) were treating them honestly, which he felt was different than the way he had been treated by a DHHS caseworker. Indeed, as is noted below, the defendant's wife initiated that October 4 interview, and during the interview, the defendant made it clear that he wanted to talk to the officers too. This reflects back on the nature of the defendant's participation in the prior interviews and demonstrates that his participation in them was wholly willing.

For these reasons, the court concludes that the defendant's statements made during the recorded interview of September 30 were voluntary.

Next, on October 3, Beaulieu and Cotton met with the defendant and the defendant's wife at their residence. At Beaulieu's request, the defendant went outside of the home to speak with the officers outside of his wife's presence. The officers' contact with the defendant lasted slightly more than 20 minutes. As Beaulieu did at the outset of the second interview at the hospital three days earlier, Beaulieu told the defendant that he was not under arrest and would not be arrested. For the reasons noted above, the court

does not find that this admonition compromised the voluntariness of the defendant's subsequent statements.

During the course of the October 3 conversation, the defendant was coherent, responsive and oriented. He began the interview by advising the officers about the updated medical condition of his son. He and the officers then discussed other persons who had access to his son. As the interview progressed, the officers continued to press the defendant to tell the truth – more pointedly than they had done so on September 30 --, expressing skepticism about the defendant's account of his conduct in light of the nature of his child's injuries. The officers' conduct toward the defendant, however, was not overbearing or coercive. *Cf. State v. Theriault*, 425 A.2d 986, 990 (Me. 1981) (exhortations to tell the truth do not render a defendant's statements involuntary). Instead, the defendant provided detailed information that was responsive to the officers' questions, and he continued to deny significant aspects of culpability urged by the officers.[1] From the totality of the circumstances relevant to the October 3 interview, the court concludes that the defendant's statements were voluntary.

The last of the recorded interviews occurred the next day, October 4. As is noted above, the defendant's wife called Beaulieu and asked him to meet with her and the defendant at their house, where they had met on October 3. The October 4 interview lasted roughly 20 minutes. Unlike the October 3 meeting, the defendant, his wife and both officers were all present during the entire time. It appears that the defendant and his wife wanted to talk to the officers when they learned that DHHS had been given custody of their injured son. At the beginning of the interview, the defendant told Beaulieu that he and his wife trusted the officers and wanted to talk to them about their situation. Even further, the defendant told Beaulieu that he wanted him to testify as a favorable witness at the court proceedings affecting issues of custody. These comments carry particular significance as the court analyzes the question of whether the defendant's involvement in

---

[1] During the recorded interviews, the defendant admitted to the officers that on two or three occasions, he removed his son from a swing in a manner that may have caused his son's head to swing about. He was adamant in his denials, however, that he handled his son in a way that, according to statements made to him by a hospital nurse, would have been sufficient to have caused the injuries that the son in fact sustained. He also continued to deny injuring his son on the day the son was transported by ambulance to the hospital.

4

the interviews with the officers was voluntary or not. The evidence establishes in its essence that the defendant welcomed the involvement of the investigating officers.

During the October 4 interview, the defendant appeared more upset than during the other instances of contact with the officers. It is apparent that this resulted from DHHS intervention in the family. Nonetheless, the defendant was focused, coherent, rational, responsive and no less in control of his faculties than he had been when he talked previously with the investigators. (In fact, from the audio recording, at the end of the conversation, the phone rang, and it sounds as if the defendant answered the phone with a light greeting.) As they had been previously, the officers asked the defendant several times about instances when he could have injured the alleged victim, but the information he provided was similar to his answers during the previous interviews. Overall, the officers were no more accusatory toward the defendant than they had been earlier, and the defendant's answers were no more inculpatory than they had been during the earlier conversations. From the totality of the circumstances, the court is satisfied that the defendant spoke with the officers voluntarily.

Finally, Beaulieu had a phone conversation with the defendant on October 5. Beaulieu was returning the defendant's wife's call, and the defendant answered when he did so. The defendant apologetically advised Beaulieu that his attorney had instructed him not to talk to investigators. Despite this, the defendant prolonged the conversation with Beaulieu, talking mostly about the actions that DHHS had taken regarding his son. Beaulieu participated in the conversation, although the defendant did most of the talking. The circumstances of the call do not call into question the voluntary quality of the comments that the defendant made to Beaulieu.

The entry shall be:

For the foregoing reasons, the defendant's motion to suppress is denied.

Dated: June 21, 2006

Justice, Maine Superior Court

5

State of Maine v Mathew Williams
Penobscot County Superior Court
Docket No. CR-2005-949

Order: Justice Jeffrey L. Hjelm

State's Attorney: Michael P. Roberts, Deputy District Attorney

Defense Attorney: Carolyn Adams, Esq.