STATE MAINE
PENOBSCOT,ss

DOCKET NO: 02-482
EAH - PEN - 9/29/2003

STATE OF MAINE                                    )
                                                  )
FILED & ENTERED
SUPERIOR COURT
SEP 29 2003
PENOBSCOT COUNTY                 )
                                                  )
                                                  )
vs.                                               )    **ORDER ON MOTION**
                                                  )    **TO SUPPRESS**
                                                  )
                                                  )
                                                  )
WAYNE OSBORNE                                     )

Pending before the court is the Defendant's Motion to Suppress Evidence. At hearing of

this matter, the State presented the testimony of one witness, Maine State Police

Detective Brian Strout (Strout). The Defendant, although present, did not testify and

called no witnesses. The court has heard and considered the evidence presented as well as

the arguments of counsel and for the reasons set forth herein, denies the motion in part

and grants the motion in part.

## BACKGROUND

Based on the evidence presented, the court makes the following findings of fact. On or

about January 21, 2002 a large fire destroyed a substantial portion of the south end of

Main St. in Lincoln, Maine. Investigator Edward Archer (Archer) of the State Fire

Marshal's office and Strout of the Maine State Police investigated the fire. In connection

with that investigation, Strout began interviewing people in the community. He first

interviewed Stephanie Hassenback who indicated that another individual named Roxane

Rochon (Rochon) might have information. He then interviewed Rochon who indicated

that the Defendant Wayne Osborne (Defendant) might have information about the fire.

On or about January 21, 2002 Strout contacted the Defendant at the home of his grandparents, Clayton and Claire Raymond in Webster Plantation, Maine. Strout did not know the grandparents and also had no prior contact with the Defendant.[1] After traveling to the grandparents' home with State Fire Marshall Ed Archer in Archer's truck, Strout went to the house, knocked at the door and asked for the Defendant. Strout was dressed in plain clothes but he identified himself as a police officer and asked the Defendant if he would come outside and speak with him. The Defendant agreed and went outside and got into the truck. The Defendant displayed no reluctance to do this. The parties had a cordial conversation of between 30 to 45 minutes in the truck while it was parked in the dooryard.[2] During the conversation, Strout commented to the Defendant, " You also would admit that if you had knowledge and didn't tell us, you realize the seriousness of that correct?" (1/21/02 Transcript, page 5) The Defendant responded "yes" and Strout then continued, "So by not telling us anything you're also realizing there's a possibility that could come back reflect on you, correct?" Again, the Defendant responded "Yes".

Strout then invited the Defendant to take a polygraph exam pertaining to the fire and the Defendant agreed. The officers indicated that they would follow up on that later and they left. At no time did the officers advise the Defendant of his Miranda rights; advise him

---

[1] The court notes from file materials that the Defendant (dob 06/04/02) was 19 years old during most of the relevant time frame. Little evidence was presented regarding his educational background, but based upon impressions gleaned from listening to the audiotape and other evidence that indicated that the Defendant held employment, the court concludes that the Defendant was at least of average intelligence and average adolescent education and experience.

[2] This conversation was recorded and the trancript was admitted at the hearing as State' Exhibit #1. This exhibit also included other taped conversations with the Defendant. The court also admitted the audio tape of the April 10, 2002 interview as Defense Exh. #2. The court has read the entire transcript and listened to the audiotape and considered both in makings the findings set forth herein.

that he did not have to answer questions or that he was not under arrest and was free to leave. The Defendant did not make any incriminating statements during this meeting.

On January 22, 2002 the officers went back to the Defendant's residence and had a brief conversation with the Defendant who confirmed that he was willing to take a polygraph exam. The parties agreed that this would be done the next day. The Defendant did not make any incriminating statements during this encounter.

On January 23, 2002, the officers went to the Defendant's residence again. The Defendant, who did not have a motor vehicle, accepted the officers' invitation for a ride to the Maine State Police Criminal Investigation Division (CID) office in Bangor. At 7:00 am the officers picked the Defendant up at his home and transported him to the CID office in Strout's unmarked State Police cruiser. The trip took a little over an hour. During the trip, the parties only engaged in small talk and there was no discussion about the fire. The Defendant was comfortable and demonstrated no apprehension or reluctance about the exam. The Defendant made no incriminating statements.

After arriving at CID, Maine State Police Officer Troy Gardner (Gardner) administered the polygraph exam. Before commencing the exam however, he read the Defendant's Miranda rights to him. The Defendant acknowledged understanding these rights and he again gave his consent to go forward with the exam. Although, Gardner appeared an hour late for the exam, once underway, the exam took approximately three hours. Strout and Archer observed the exam via video camera in another location.

3

Gardner also did the post exam interview and advised the Defendant that he had concluded that the Defendant was being deceptive about his knowledge of the fire and about his involvement in the fire. The Defendant responded by stating that he did not want to talk with Gardner anymore and the interview promptly terminated. The Defendant made no incriminating statements during the exam or post-exam interview.

The Defendant didn't express any reluctance to going with the other two officers and they left with the Defendant to travel back to the Defendant's home in Webster Plantation. Although the parties spoke generally about the nature of the polygraph exam, the officers did not initially engage the Defendant in discussion about the fire.

The officers did not take the Defendant directly home to Webster Plantation, however. Instead, they asked the Defendant to show them the home of Trish Trump, a young woman whose name had come up earlier in the investigation. The Defendant agreed and the officers took him to the nearby community of Chester to see where Trump lived.

During this part of the trip, the officers confronted the Defendant and told him that they believed that he had knowledge about the fire. The Defendant did not respond. As the officers turned onto Rt. 168 in Winn, the Defendant said that he wanted a cigarette. The officers stopped the vehicle and the Defendant got out and had a cigarette. When he had finished his cigarette, he got back in the car and said that he was willing to tell them what he knew about the fire.

The Defendant proceeded to tell them that Jason Marcensi (Marcensi) was responsible for the fire. The officers chose not to question the Defendant further in the vehicle. Instead, they drove another 10 to 15 minutes to the Lincoln Police Department where the police continued their interview of the Defendant.[3] No Miranda warnings were given at the police station and the officers made it clear that the Defendant was free to leave at any time. During this interview, which lasted between 40 minutes to an hour, the Defendant implicated Marcaseni in the fire. The Defendant gave some additional details about Marcensi's involvement that included an admission allegedly made by Marcensi to the Defendant acknowledging that Marcensi had set the fire.

During this interview, the Defendant indicated that he had failed the polygraph because did have knowledge about the fire but that he was afraid of revealing it because Marcaseni had threatened to harm him and his friend Casey Munson (Munson) if he told anyone. The Defendant acknowledged at the end of the interview that he had not been promised anything and that he had come forward with the information in order to relieve his conscience. During this interview, the Defendant did not make any incriminating statements. The officers concluded the interview and took the Defendant back to his home in Webster Plantation.

The next police contact with the Defendant occurred on January 24th. The police did not interview the Defendant on this occasion, but they did monitor and tape record a

---

[3] This interview was also tape-recorded and a transcript of the interview is included within State's Exh. #1.

telephone conversation that the Defendant had with Rochon[4]. The Defendant made no incriminating statements during this telephone conversation.

On January 25th, the officers arranged to meet with the Defendant in Winn. At the officer's request, the Defendant agreed to call Marcaseni on the telephone to see if he might say something about the fire. The Defendant expressed no reluctance in undertaking this effort for the police and he appeared to be genuinely engaged in the ruse. The Defendant was cooperative throughout. To make this call, they used the telephone at the home of the Defendant's other grandparents in Madawamkeag. They were not able to reach Marcaseni by telephone. He expressed no reluctance to continuing the effort to reach Marcaseni so the Defendant and the officers made another effort the next day. This was also unsuccessful. At this point, the Defendant said that he no longer wanted to do this. The Defendant did not incriminate himself in any way during this effort.

On January 28, 2002, the officers went to the Defendant's place of employment to talk with him. This greatly upset the Defendant and the officers stayed only briefly. While there, the officers told the Defendant that they believed that he was involved in the fire and that the best thing for him to do was to cooperate in order to clear himself. The Defendant did not make any incriminating statements during this encounter.

On January 31, 2002, the officers had left a message for the Defendant at his work indicating that they would like to meet with him at the Lincoln Police Department. The

---

[4] This tape-recorded conversation is included within State's Exh. #1.

Defendant responded to this message by going to the police station and telling the officers that he would only speak with the officers at his grandparents' home in Webster. The Defendant then left and went home. The Defendant did not make any incriminating statements during this meeting.

The next police contact with the Defendant occurred on April 10, 2002. Strout and Archer went to the Defendant's place of employment and waited for him there. The Defendant arrived for work and he was upset again that the officer's had gone to his place of employment. He said that he did not want to speak with the officers and they turned to leave. However, as they turned to leave, the Defendant then told them that he would be willing to speak later, but just with Strout alone, and only at his grandparents' home in Webster Plantation.

Strout went to Webster Plantation. The Defendant was not there when the officer first arrived, but he appeared a short time later. The officer asked to speak with the Defendant out in his cruiser. The Defendant replied "sure" and went outside with Strout. He demonstrated no reluctance in doing this.

Although earlier conversations with the Defendant had been openly tape recorded with his knowledge and consent, this conversation was tape recorded without the Defendant's knowledge or consent. Strout testified that he did this because he felt that the Defendant would be more comfortable in talking with him if the tape recorder were not openly

displayed. The officer did not give the Defendant any Miranda warnings on this occasion.

Up to this point, the Defendant had denied any participation in the fire and only purported to have knowledge of involvement by others. During this interview however, the officer advised the Defendant that Marcensi had an alibi for the night of the fire. In response to this information, the Defendant changed his story and for the first time directly implicated himself directly in the fire. The Defendant ultimately reported to the officer that Rochon had asked him to take her into Lincoln because she had some unidentified friends that wanted her to set fire to a building in Lincoln. According to the Defendant, she was to be paid $600 for setting the fire. Following Rochon's disclosure to the Defendant, Munson arrived and the three of them traveled into Lincoln. The Defendant said that he dropped Rochon off near the mall and then he and Munson went into the Rite Aide store to wait. The Defendant reported that 15 to 20 minutes later, Rochon appeared and told him that she had lit fire to the mall.

The transcript of this interview contains the following significant excerpts:

> Strout: "...So now is the time for you to do what's right for Wayne. Okay? And that is to tell us exactly what is going on. I can't protect you and I can't help you if I don't know the truth. I need the Good's honest truth from ya, okay?..I think you got pulled along [by others]. So that's why it's important for you to do the right thing for yourself and that's to tell us what's going on...This is your chance to step up to the plate, okay? You've got to tell the truth. Okay? Because that's the only thing, the truth will set you free." (4/10/02) Transcript, page 1)

Strout: " You're involved but it's to the degree that you're involved that's really important now. So the next few minutes are going to be the most important minutes of your whole life. Okay? So now its time to tell me exactly what's going on so I understand so we can do the right thing here" (4/10/02) Transcript, page 1)

The Defendant then asked a question: "What happens to me" (4/10/02) Transcript, page 2)

Strout answers:

"I'm not taking you anywhere tonight. You're not going to jail at this point, okay? I can't make any promises what's going to happen or where everything might go. Okay? That's down the road. Tonight you're not going anywhere. You're not going anywhere. You and I are just going to talk and then you're going to go back in. Okay? But it all depends on how it goes as to when it goes or how it goes. That's why I say the next few minutes are the most important part of your life. Okay? Because however that goes is going to be huge for you. Okay? People understand this. People that make these kinds of decisions they understand how easily somebody can be led or used." (4/10/02) Transcript, page 2)

Prior to April 10, 2002, the Defendant had implicated only Rochon in the fire and he expressed fear of reprisal from her unidentified "friends". Strout pressed the Defendant to divulge what he knew about the fire and asserted that it was the only way that law enforcement could protect him. Strout also told the Defendant that when they approached Rochon, she was going to "sing" and that after that,

"...it's a race to who can get to the finish line first. Okay? She's going to come out and say it was you, you, you, you. That's why its' important for you right now. This is your date in time right now to tell us the truth. Okay? And the only

way we can do the right thing is for you to tell us the truth."(4/10/02) Transcript, page 3)

The Defendant then proceeded to describe how Rochon and Munson had asked him for a ride downtown. He stated that he didn't know that they were going to burn down the building. The Defendant then described his activities earlier in the evening; he still did not implicate himself in the fire. He simply indicated that he "knew" that she had set the fire without fully explaining the nature or source of his information or why this was so. Strout responded to the Defendant's story by reminding the Defendant that the polygraph didn't lie and that while they were "getting there", he didn't feel the Defendant was yet telling him everything. Strout stated:

"...you're not telling me everything. You've got to tell me everything. You can't hold anything back. You've got to tell me every, everything, Help me understand here. Because I'm not understanding. If I don't understand the people that make the decisions aren't going to understand either. Okay? You've got to tell me the truth. Come on. You're holding back. Don't hold back. Did Roxanne tell ya why she started that fire? You need to tell me now. Did she do it for somebody else? You need to tell me Wayne. Don't hold back. I'm telling ya, it's not going to help you out. It's not going to help ya. Why did Roxanne start that fire? (4/10/02 Transcript page 9)

The Defendant supplied a few additional details and then Strout replied,

"These women are going to screw you over if you don't come clean with this. They are going to do it. So you've got to tell me the truth. Now is the time. Okay?" (4/10/02 Transcript page 10)

It is significant to the court that the Defendant then responds, " If I tell you the truth what do I get?"(4/10/02) Transcript page 10)

Strout answers,

"I can't make you any deals but I can tell you this-that I'm going to tell them he told me the truth, he finally told me the truth. He's not the one but he's the one that did the right thing. And that goes a long way with people that make the decision." (4/10/02 Transcript page 10)

Strout continued to tell the Defendant that [law enforcement] wanted to get the person who was really responsible. He then states,

"You might have had a little part in it. Okay? But you did the right thing when the time was right. And the people that make those decisions, that's what makes the difference from people just being an accessory or whatever. Okay? To being the person that lit the matches, the person that did it. And that's huge. That's everything. Especially from where you're sitting right in that seat right there. That's everything. Everything there is. The most important thing. So let's cut the bullshit now. Okay?..." (4/10/02 Transcript page 10)

To this the Defendant gave only an "Uh hm" affirmative response and Strout continued talking and telling the Defendant that he would feel much better once he had told the truth. He also told him,

"I can't make you a deal because that's not my position. But I can do all I can to tell the people that do make the decision because you did tell me the truth. But they go a lot on my instinct and they go a lot on my experience as a detective. And that goes a long ways towards making decisions that way Wayne. Okay but I can't help ya. I can't help ya if I don't know the truth. And I want to help ya. And I'm your best friend right now. Because I'm the guy, I'm the guy that's going to put the person that caused all this heartburn away..."(4/10/02 Transcript page 11)

Strout continued the interview and had the Defendant go back over his story. This time, however, the Defendant included an additional detail. He said,

" Then before Casey (Munson) showed up me and Roxanne (Rochon) got in the truck. She asked me for a ride because she was going to go burn a building." (4/10/02 Transcript page 12)

Prior to making this statement, the Defendant had not implicated himself in the fire either as a principal or as an accomplice. This statement clearly implicates the Defendant as an

11

accomplice as the result of his knowingly driving Rochon to downtown Lincoln to commit arson. Strout continued the interview by pressing the Defendant for additional details pertaining to Rochon's actions before during and after the fire was started and the Defendant supplied them.

It is apparent from the audiotape that the Defendant's grandfather attempted to stop the interview by going to the cruiser and telling Strout that he had talked to the Defendant long enough. (4/10/02 Transcript page 16). Strout responds to the Defendant's grandfather in part as follows:

"Let me tell you something sir. This gentleman has just done the smartest thing that's he's done yet. And that's tell the truth. We're almost done here. Don't jeopardize his, his future by getting into this. We're almost done here. He's not going anywhere. He's coming back in with you. He' going to stay here. And the reason is because he's told the truth tonight. Okay? He's taken a step towards freedom. Because he's told the truth. So let him finish here, and he's almost done and then I'm going to leave...." The Defendant's grandfather objected to Strout's bothering the Defendant and Strout after stating that the Defendant had some involvement in the fire, responded in part, "... [the Defendant isn't going with the officer] Because he's finally done the right thing and told the truth. Okay? So don't screw it up for him here. Okay?" (4/10/02 Transcript page 16)

Strout also told the Defendant,

"But you know the only thing that hurt is when we have to keep trying to pry it out of ya. Okay? Now's your chance to tell me anything else that you think I should know. Don't hold it back. Okay?"(4/10/02 Transcript page 18)

Strout drew the interview to a close by telling the Defendant, "I'm going to be able to tell them you did the right thing tonight. Okay?"(4/10/02 Transcript page 20) He also assured the Defendant that he wouldn't tell anyone what the Defendant had told him and that he would protect him from harm from Rochon's friends. He also indicated that he

would be following up on the information provided and that he would get back in touch with the Defendant .

Strout next contacted the Defendant at his place of employment on April 18, 2002. On this occasion, the officer offered to have Dan Ireland (Ireland) his employer present during the interview. The Defendant consented but expressed a desire to go somewhere else. The parties traveled to a location near the Lincoln Airport where they talked. It appears that Strout had an initial "rehearsal" interview with the Defendant and Ireland and then had the Defendant repeat his statements for the tape-recorder. These later statements were tape recorded. [5] During this interview, the Defendant implicated another of his friends, Matthew Miller (Miller) by indicating that Rochon and Miller were involved in the fire together. The Defendant described Miller's involvement and he also described his fear of retaliation from Miller. The transcript reveals that the Defendant acknowledged that he was not under arrest and that he was free to leave at any time. The transcript also concludes with the Defendant's acknowledgement that Strout can't make any deals for him. The entire interview lasted approximately 30 to 40 minutes. The tape-recorded portion lasted about 11 minutes. The Defendant was not advised of his rights at any time.

Police arrested the Defendant on April 23, 2002 and charged him with arson. The court's file reflects that the Defendant requested the appointment of counsel at his initial court appearance. The court gave him the required forms and the Defendant filled them out.

---

[5] This transcript is also part of State's Exhibit #1.

The court did not act on the Defendant's request for counsel at that time. At the Defendant's next court appearance on May 21, 2002 the court found that the Defendant had employment and was not indigent and the court declined to appoint counsel.[6]

On May 31, 2002 the Defendant had a chance encounter with Strout at a neighbor's home near to his own residence. The officer was there conducting another aspect of the investigation and the Defendant approached him and said that he wanted to speak with the officer. They went outside and talked. During this encounter, the Defendant reported to Strout that it was Miller that he had dropped off at the scene of the fire.

Strout's final encounter with the Defendant was on July 5th. Miller had reported to police that the Defendant and a person named A.J.Jones had set the fire. The police went to the Defendant and asked him whom A.J. Jones was. The Defendant responded that A.J. Jones was not involved.

## DISCUSSION

The Defendant seeks suppression of all statements emanating from his encounters with the police on April 10, April 18, May 31 and July 5. The State agrees that any statement obtained from the Defendant on July 5th violated the Defendant's 6th Amendment right to counsel and the court ORDERS that any statement obtained from the Defendant on July 5th be suppressed.

I.      **April 10, 2002 interview.**

---

[6] The Defendant also requested court appointed counsel on June 18, 2002. The Court denied this request. The court's file does not reflect the entry of appearance by any retained counsel.

14

The Defendant contends that the State elicited his statements made on April 10, 2002 by inducement and they are therefore involuntary and inadmissible. The court agrees. This court must consider the totality of the circumstances in determining whether a confession is voluntary. State v. Lockhart, 2003 ME 108, ¶ 30. In making its decision, the court considers the following factors: the details of the interrogation; duration of the interrogation; location of the interrogation; whether the interrogation was custodial; the recitation of Miranda warnings; the number of officers involved; the persistence of the officers; police trickery, threats, promises or inducements made to the defendant; the defendant's age, physical, mental health, emotional stability, and conduct. Id citing State v. Sawyer, 2001 ME 88 ¶9, 772 A.2d at 1176.

The evidence indicates that Strout conducted the interview of April 10 alone in his police cruiser in the dooryard of the Defendant's home. The Defendant had previously indicated a preference for this locale for earlier interviews and never demonstrated any discomfort with this setting. The Defendant was aware that he could terminate a police interview as he had done earlier with Gardner and as he had also previously done when the police contacted him at his place of employment. The interview was not particularly long in duration. The court is satisfied that the Defendant was not in a custodial setting during the initial portion of the April 10th interview. No Miranda warnings were given and none were required.

Arguably however, Strout's persistent and insistent questioning of the Defendant; his rebuff of the Defendant's grandfather who sought to terminate Strout's interview of the

15

Defendant; and his statements that "now was the time" were gradually and purposefully creating a strong sense of urgency for the Defendant. More importantly, the court finds they also cultivated a sense of expectation in the Defendant. After listening to the audio tape and reviewing the transcript of this interview, the court finds that during the April 10, 2002 interview, Strout was saying one thing but meaning another regarding potential benefits to the Defendant if he agreed to talk. Taking his words at face value, Strout was saying that he couldn't make any deals with the Defendant in exchange for his statements. The total content of his message, considered in the light of the circumstances in which it was communicated to the Defendant, was to the contrary. Notwithstanding his attempt to qualify his words, the court concludes that Strout sought to make the Defendant believe that he would derive a significant benefit from cooperating with the officer on April 10, 2002.

Only a voluntary confession is admissible into evidence, and the State must prove voluntariness beyond a reasonable doubt. Confessions made in return for assurances or promises of leniency are inadmissible. State v. McCarthy, 2003 ME 40, ¶12, 819 A.2d 335, 340. Even if Miranda warnings had been required and had been given, a confession may be involuntary not only when it is extorted from the accused by threat but also when it is elicited by a promise of leniency. The promise must amount to more than a mere admonition or exhortation to tell the truth. State v. Theriault, 425 A.2d 986, 990. However, an inducement that contains an implied promise of leniency, *however slight*, (emphasis supplied) will render an admission involuntary State v. Tardiff, 374 A.2d

16

598,600. It must also appear however, that the promise was the motivating cause of the confession. Id at 601.

The court finds that Strout made repeated implied promises of leniency to the Defendant and that these promises produced the Defendant's incriminating statements.

Although they were accompanied by the officer's disclaimer that he could not make deals, the disclaimer was followed by an assertion of the officer's ability to influence the decision makers. On the whole, the court finds that Strout's statements made to the Defendant were intended to leave the Defendant with the understanding that if he answered Strout's questions and if he provided information to Strout it would benefit him and if he didn't cooperate, it would hurt him. The following excerpts lead the court to his conclusion.

At the outset of the interview, Strout emphasizes the need to tell the police what he knows during that interview, he says,

> "...So now is the time for you to do what's right for Wayne. Okay? And that is to tell us exactly what is going on. I can't protect you and I can't help you if I don't know the truth. I need the God's honest truth from ya, okay?..I think you got pulled along [by others]. So that's why it's important for you to do the right thing for yourself and that's to tell us what's going on...This is your chance to step up to the plate, okay? You've got to tell the truth. Okay? Because that's the only thing, the truth will set you free. (4/10/02 Transcript page 1)

The court interprets this latter comment to mean that telling the truth will ease the Defendant's conscience, but the rest of the statement is intended to impress upon the

17

Defendant a sense of "now or never" urgency. Strout adds to this sense of urgency with his next comments to the Defendant,

> " You're involved but it's to the degree that you're involved that's really important now. So the next few minutes are going to be the most important minutes of your whole life. Okay? So now its time to tell me exactly what's going on so I understand so we can do the right thing here (4/10/02 Transcript page 1).

The Defendant then asked a question: "What happens to me". (4/10/02 Transcript page 2) This is an indication to the court that the Defendant is considering making a statement but he wants to know from the police what the consequences will be for him if he answers their questions. Strout clearly recognized that the Defendant was close to giving him what he wanted.

Strout answers:

> "I'm not taking you anywhere tonight. You're not going to jail at this point, okay? I can't make any promises what's going to happen or where everything might go. Okay? That's down the road. Tonight you're not going anywhere. You're not going anywhere. You and I are just going to talk and then you're going to go back in. Okay? But it all depends on how it goes as to when it goes or how it goes. That's why I say the next few minutes are the most important part of your life. Okay? Because however that goes is going to be huge for you. Okay? People understand this. People that make these kinds of decisions they understand how easily somebody can be led or used. (4/10/02 Transcript page 2)

Clearly these words are intended to pressure the Defendant to decide to speak with the police. To be told that one only has a few minutes to make a "huge" decision and that "the people who make the decisions" are watching creates a sense of urgency that borders on coercion. Strout's statement that "it all depends" on "how it goes in the next few minutes" directly links the Defendant's fate to his decision to answer questions or not.

It is important to remember that up to this point in the interview, the Defendant had maintained that it was Rochon who had set the fire and that he had no involvement. Strout continued to press the Defendant to divulge what he knew about the fire and asserted that it was the only way that law enforcement could protect him. Strout also told the Defendant that when they approached Rochon, she was going to "sing" and that after that:

> "it's a race to who can get to the finish line first. Okay? She's come going to come out and say it was you, you, you, you. That's why its' important for you right now. This is your date in time right now to tell us the truth. Okay? And the only way we can do the right thing is for you to tell us the truth." (4/10/02 Transcript page 3)

The Defendant then proceeded to describe how Rochon and Munson had asked him for a ride downtown. He still doesn't incriminate himself, however, because he also states that he didn't know that they were going to burn down the building (Transcript page 4). The Defendant then described his activities earlier in the evening; he still did not implicate himself in the fire and he didn't initially even indicate that Rochon had admitted starting the fire. He simply indicated that he "knew" that she had without fully explaining the extent or source of his information.

Strout responded to this by reminding the Defendant that the polygraph didn't lie and that while they were "getting there", he didn't feel the Defendant was yet telling him everything. Strout stated:

> "...you're not telling me everything. You've got to tell me everything. You can't hold anything back. You've got to tell me every, everything, Help me understand here. Because I'm not understanding. If I don't understand the people that make the decisions aren't going to understand either. Okay? You've got to

tell me the truth. Come on. You're holding back. Don't hold back. Did Roxanne tell ya why she started that fire? You need to tell me now. Did she do it for somebody else? You need to tell me Wayne. Don't hold back. I'm telling ya, it's not going to help you out. It's not going to help ya. Why did Roxanne start that fire? (4/10/02 Transcript page 9)

These statements continue to link "help" for the Defendant with his making a statement.

The Defendant supplied a few additional details and then Strout replied,

"These women are going to screw you over if you don't come clean with this. They are going to do it. So you've got to tell me the truth. Now is the time. Okay?" (4/10/02 Transcript page 10)

It is significant that the Defendant then responds, " *If I tell you the truth what do I get?*" (4/10/02 Transcript page 10) It's clear that the Defendant wants to know what the benefit to him is going to be. If he makes a statement and tells what he knows, what does he get in return?

Strout recognizes that the Defendant is looking for a deal and he answers,

"... I can't make you any deals but I can tell you this-that I'm going to tell them he told me the truth, he finally told me the truth. He's not the one but he's the one that did the right thing. And that goes a long way with people that make the decision." (Transcript page 10)

Although Strout has used words that indicate he can't make any "deals", taking Strout's statements in their entirety, he has answered the Defendant's inquiry by telling him that although he can't make any "deals", he can give the Defendant something else. If the Defendant talks, Strout is going to give the Defendant his help by using his influence with the decision makers to the Defendant's advantage.

20

Strout continued to tell the Defendant that [law enforcement] wanted to get the person who was really responsible. He then states,

"You might have had a little part in it. Okay? But you did the right thing when the time was right. And the people that make those decisions, that's what makes the difference from people just being an accessory or whatever. Okay? To being the person that lit the matches, the person that did it. And that's huge. That's everything. Especially from where you're sitting right in that seat right there. That's everything. Everything there is. The most important thing. So let's cut the bullshit now. Okay?" (4/10/02 Transcript page 10)

Strout's statements, taken in conjunction with the earlier statements, in effect tell the Defendant that if he talks, Strout will use his influence and as a consequence, the Defendant will only be charged as an accessory and this would make a huge difference for the Defendant.

To this the Defendant gave only an "Uh hm" affirmative response and Strout continued talking and telling the Defendant that he would feel much better once he had told the truth. He also told him,

"I can't make you a deal because that's not my position. But I can do all I can to tell the people that do make the decision because you did tell me the truth. But they go a lot on my instinct and they go a lot on my experience as a detective. And that goes a long ways towards making decisions that way Wayne. Okay but I can't help ya. I can't help ya if I don't know the truth. And I want to help ya. And I'm your best friend right now. Because I'm the guy, I'm the guy that's going to put the person that caused all this heartburn away..." (4/10/02 Transcript page 11)

With this statement Strout disclaims his authority to make deals but at the same time, he confirms his ability to influence the decision makers who presumably will determine the Defendant's fate. He effectively conditions the rendering of assistance to the Defendant

21

upon the Defendant's cooperation with him. The court finds an implied promise of leniency in the totality of Strout's statements, notwithstanding that they also contain disclaimers of deal making authority. Under Tardiff, even a slight implied promise of leniency is enough to create doubt regarding the voluntariness of a confession. Tardiff at. P. 600 citing Bram v. United States, 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897).

After answering the Defendant's inquiry about what he would get for his cooperation, Strout continued the interview and had the Defendant go back over his story. This time, however, the Defendant included an additional detail. He said,

> " Then before Casey (Munson) showed up me and Roxanne (Rochon) got in the truck. She asked me for a ride because she was going to go burn a building." (4/110/02 Transcript, page12)

Up to this point, the Defendant had not implicated himself in the fire either as a principal or as an accomplice. This statement clearly implicates the Defendant as an accomplice as the result of his knowingly driving Rochon to downtown Lincoln to commit Arson.

In addition to finding that the Defendant's statement was induced by an implied promise of leniency, the court must also consider whether that implied promise was the motivation that led to the Defendant's confession Tardiff at p. 601. Under the circumstances described above, the court can come to no other conclusion than that. Until Strout answered the Defendant's question about what benefit he would get, the Defendant hadn't implicated himself at all in the crime. Once he got the answer, he quickly implicated himself. The court finds the requisite link between the improper promise and the confession existed on April 10, 2002.

22

The court also finds that Strout had portrayed himself, as someone the Defendant could reasonably believe could make good on the promise. Tardiff, p. 601. Strout had clearly stated that his instincts and his experience as a dectective, would "go a long way" with the decision maker. (4/10/02 Transcript p. 11). There is no point to this statement unless it is to let the Defendant know that he can deliver the help that he has promised. The court finds that it would be reasonable for the Defendant to conclude that Strout could influence the ultimate decision makers.

Strout continued the interview by pressing the Defendant for additional details pertaining to Rochon's actions before during and after the fire was started and the Defendant supplied them.

As indicated above, the audiotape demonstrates that the Defendant's grandfather attempted to stop the interview by going to the cruiser and telling Strout that he had talked to the Defendant long enough. (4/10/02 Transcript page 16). Strout responds to the Defendant's grandfather in part as follows:

> "Let me tell you something sir. This gentleman has just done the smartest thing that's he's done yet. And that's tell the truth. We're almost done here. Don't jeopardize his, his future by getting into this. We're almost done here. He's not going anywhere. He's coming back in with you. He' going to stay here. And the reason is because he's told the truth tonight. Okay? He's taken a step towards freedom. Because he's told the truth. So let him finish here, and he's almost done and then I'm going to leave...." ( 4/10/02 Transcript page 16)

The audio tape is an important part of the evidence in this case. Listening to this recorded statement, which was also obviously heard by the Defendant, confirms for the court that an exchange has just taken place. The Defendant has just secured an important benefit for himself by talking with the officer. This is consistent with the court's interpretations of the officer's pre-confession transcribed statements.

Confirming this interpretation is Strout's further statement,

> "But you know the only thing that hurt is when we have to keep trying to pry it out of ya. Okay? Now's your chance to tell me anything else that you think I should know. Don't hold it back. Okay?"(Transcript page 18)

The clear meaning of this post admission statement is that not only is there reward for cooperation but there is potential punishment for lack of cooperation. These latter comments did not elicit further incriminating statements from the Defendant but in the court's view, they support the overall conclusion, that the officer created an expectation in the Defendant that if he confessed his involvement in the Lincoln fire it would make a hugely advantageous difference to the Defendant because he would then only be charged as an accessory to arson.

The State must prove voluntariness beyond a reasonable doubt. Because the State elicited the incriminating statements from the Defendant though the use of implied promises, the court has a reasonable doubt regarding the voluntariness of the Defendant's statements made on April 10, 2002 and it concludes that the State has failed to sustain its burden.

24

The court orders that the Defendant's statements made to Strout on April 10, 2002 be suppressed as evidence against him in any subsequent trial.[7] Included within this suppression order are statements originally made on April 10, 2002 and repeated in subsequent interviews.

## II.    April 18 Interview.

The Defendant challenges the admissibility of the statements that he made on April 18, 2002 on the grounds that the statements were involuntary and were obtained in violation of the Defendant's right to remain silent. Although one could speculate that only one week after a promise of favorable treatment, the Defendant would have a continuing expectation of leniency based on Strout's interview with him on April 10, 2002, the record does not contain evidence of such an expectation. This interview was also tape recorded, in part, and there is nothing on the tape that the court could construe as rising to the level of an express or implied promise of leniency or favorable treatment. The transcript of this interview reflects that the police honored the Defendant's request to move away from his place of employment to talk, his employer, a familiar supporter was included and present, and unlike the earlier interviews, this interview was preceded by the Defendant's acknowledgement that he was speaking with the officer out of his own free will; that he was not under arrest; and that he was free to go at any time. Accordingly, the court finds beyond a reasonable doubt that on April 18, 2002 the Defendant's statements were voluntarily made.

---

[7] In light of this ruling, the court does not address directly the Defendant's other challenges to the admissibility of the Defendant's statements.

The court also finds that the Defendant was not in custody and accordingly, no Miranda warnings were required.

During the course of this April 18, 2002 interview, Strout asked the Defendant to recount his activities starting with the day before the fire. During this interview, the Defendant recanted his earlier statement of April 10, 2002 that Rochon had told him that she needed a ride to Lincoln so that she could start a fire. The essence of the Defendant's new account was that he had simply given Rochon a ride to the Lincoln downtown mall and had dropped her off. He denied being told that she was going to start a fire. He added new additional information that he had seen Miller give $600 to Rochon and that Rochon had simply said that she was going to go do a favor for an unidentified friend.

Insofar as the Defendant's statements on April 18th are repetitions of statements made on April 10th, they are suppressed as provided above. The Defendant's motion to suppress other statements made on April 18th is denied.

## III.   May 31's Interview

The Defendant challenges the admission of statements made on May 31 to Strout on the basis of claimed violations of his Fifth Amendment right to remain silent and upon his Sixth Amendment right to the assistance of counsel. The evidence at hearing and the contents of the court's file indicate that the police arrested the Defendant on April 23, 2002 for arson. He appeared in court on that same day and requested the appointment of

counsel. Although the court denied this request it is clear that the Defendant's right to counsel had attached as of April 23, 2002.

Citing Edwards v. Arizona, 451 U.S. 477, 484, 101 S.Ct. 1880, 68 L. Ed. 2d 378 (1981), the Law Court has said,

> "In the context of the Fifth Amendment and the privilege against self-in crimination, the Supreme Court has ruled that'[W] hen an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if the has been advised of his rights. We further hold that an accused, such as Edwards, having expressed his desire to deal with police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.'" State v. Rose 604 A.2d 24,27 (Me. 1992)

In Rose, the Law Court clearly indicated that the Defendant's right to counsel under the Sixth Amendment is no different; "…after the initiation of formal charges, the Sixth Amendment guarantees the accused the right to rely on counsel as a medium between him and the State." Rose at p. 26. In Rose, the Law Court also cited with approval the following language from Michigan v. Jackson, 4475 U.S. 625, 636, 106 S.Ct.1404, 1411, 89 L.Ed. 2d 631 (1986):

> "We thus hold that, if police initiate interrogation after a defendant's assertion, at an arraignment or similar proceeding, of his right to counsel, any waiver of the defendant's right to counsel for that police-initiated interrogation is invalid."
> Rose at p. 27

It's clear to the court that the Defendant's right to counsel had attached long before May 31, 2002. But for one critical fact, his statements to Strout on May 31,2002 would be

inadmissible. That critical fact is that it was the Defendant who initiated the contact that occurred on May 31, 2002 between the Defendant and Strout. From the evidence presented, the court finds that the officer was at another residence in the vicinity of the Defendant's home and the Defendant went to the officer to ask to speak with him. The officer obliged. The Defendant was not in custody and the police did not initiate any interrogation. The court concludes that the police did not improperly exploit an opportunity or otherwise seek to circumvent the Defendant's rights on May 31, 2002.

The Defendant further argues that the State's conduct on May 31, 2002 violated his due process rights to the extent that it offended the community's sense of justice, decency and fair play. The court finds this argument to be without merit.

Accordingly, the Defendant's motion to suppress statements made on May 31, 2002 is denied.

## IV.    July 5th Interview.

The State concedes that police interrogation of the Defendant on July 5, 2002 violated the Defendant's Sixth Amendment right to counsel and accordingly, the court grants the Defendant's motion with regard to statements made on July 5, 2002 and Orders that they shall not be admitted in any subsequent trial of this matter.

The entry shall be:  The Defendant's Motion to Suppress is granted in part and denied in part.

Dated September 25, 2002

JUSTICE, SUPERIOR COURT

29