2008 ME 77

**STATE of Maine**

v.

**Christian NIELSEN.**

Supreme Judicial Court of Maine.

Argued: April 8, 2008.
Decided: May 6, 2008.

---

Margot Joly, Esq. (orally), Ron E. Hoffman, Esq., Rumford, ME, for Christian Nielsen.

G. Steven Rowe, Attorney General, Andrew Benson, Asst. Atty. Gen., Donald W. Macomber, Asst. Atty. Gen. (orally), Augusta, ME, for the State of Maine.

Panel: SAUFLEY, C.J., and CLIFFORD, ALEXANDER, LEVY. SILVER, and MEAD, JJ.

LEVY, J.

[¶ 1] Christian Nielsen appeals from a judgment of conviction entered in the Superior Court (Oxford County, *Crowley, J.*) on his conditional guilty plea to four counts of murder, 17–A M.R.S. § 201(1)(A) (2007). Nielsen contends that the court erred when it denied, in part, his motion to suppress statements he made to police officers before and after his arrest, as well as evidence obtained as a result of those statements. We affirm the judgment.

## I.  BACKGROUND

[¶ 2] The following facts, as found by the suppression court, are supported by the evidence. On September 4, 2006, at approximately 5:30 P.M., Trooper Dan Hanson of the Maine State Police received a dispatch telling him that there had been a report of an "unattended death" at the Black Bear Inn in Newry. Upon arriving at the Inn, Trooper Hanson spoke first with Lee Graham, who told the trooper that her husband, Charles Nielsen, had found bodies by the Inn and that her stepson, Christian Nielsen, had told Charles that he had killed some people. Lee then directed Hanson to two men sitting on a bench, Nielsen and his father Charles. After radioing for assistance, Hanson approached the father and son and asked Nielsen "What [is] going on?" Nielsen looked at Hanson's nametag and replied, "Well, I killed some people, Dan. I shot them all. The gun's in the house in the tool chest." Hanson then asked when this had happened, to which Nielsen responded that it had been awhile.

[¶ 3] Trooper Hanson advised Nielsen of his *Miranda* rights, reciting the warnings from memory, and Nielsen acknowledged that he understood his rights. Hanson then asked Nielsen if he would like to tell Hanson what had happened, and Nielsen stated that he did, but he only wanted to say it once. Hanson did not ask Nielsen any further questions about the deaths, but did inform Nielsen that detectives would be arriving shortly and he could tell them what had happened. Hanson then handcuffed Nielsen and placed him in his police cruiser. Once Hanson had placed

Nielsen in the police cruiser, Hanson turned on his in-car video recorder.

[¶ 4] Shortly after Nielsen was placed in the police car, his father Charles came to the car window and asked him, "Shouldn't you wait for counsel?" Nielsen responded "Yeah, not a bad idea." Trooper Hanson thereafter advised Nielsen that it was up to him whether or not he spoke with detectives, to which Nielsen stated that he would speak with them.

[¶ 5] Trooper Hanson waited for additional law enforcement officers to arrive at the Inn, and then he asked Charles to describe where he had found the victims. Hanson followed a trail of blood leading out of the Inn and through the grass to some brush. In this brush, Hanson discovered the remains of two dismembered human bodies as well as the remains of two dogs. Hanson did not know at that time how many potential victims he was looking for, so he returned to his police cruiser and said to Nielsen, "I know you invoked your rights and you want to speak to counsel. But I need to ask this question just for the purpose of (unintelligible). Is there any chance there is anyone here alive? I don't want to leave someone out there bleeding." Nielsen responded that everyone was dead.

[¶ 6] Later that evening, while waiting for the detectives to arrive, Charles told Trooper Hanson that he had learned from Nielsen that there were four victims in total, three near the Inn and one in Upton. Hanson eventually received directions from both Charles and Nielsen regarding where he could find the third victim at the Inn, and Hanson followed these directions and discovered a third body under a tarp approximately fifty yards from the first two bodies.

[¶ 7] Game Warden Norm Lewis arrived at the Black Bear Inn shortly after 6 P.M. and approached Trooper Hanson, who was speaking with Charles at the rear of the police cruiser. Hanson asked Warden Lewis if he was familiar with the Brown Company Road in Upton because there was possibly another victim there. Charles suggested that they ask Nielsen for directions to the fourth victim, but Hanson stated that because Nielsen had expressed his desire to only tell his story once, there would be no further questioning of Nielsen until detectives arrived. It was at this time that Hanson went to look for the third victim at the Inn, while Lewis was left at the police cruiser to watch Nielsen.

[¶ 8] While Trooper Hanson was gone, Charles approached Nielsen and initiated a conversation with him, indicating that the police would be going to Upton. Nielsen stated that this would be good because that was where his mother lived, at which point Charles clarified that the police would be going to Upton to look for the fourth victim. Nielsen stated that the police would not find the body because he had burned it. Nielsen then gave detailed directions to Warden Lewis regarding where he had burned the fourth victim, without Lewis's prompting. The only question Lewis asked Nielsen was for clarification at one point in his directions.

[¶ 9] Later that evening, Warden Lewis led other officers to the location where Nielsen had told Lewis he had burned the fourth victim. Lewis and the officers found the fire pit Nielsen had described, and a forensic anthropologist later confirmed that the pit contained the remains of the fourth victim.

[¶ 10] Detective Jennifer King from the Maine Criminal Investigations Division arrived at the Black Bear Inn at around 7:30 P.M. Upon arriving, Trooper Hanson advised Detective King that Nielsen had stated he had killed some people, that

Hanson had then read Nielsen his *Miranda* rights, and that Nielsen had responded that he only wanted to tell his story once and had made mention of counsel. King approached Nielsen, who was still sitting in Hanson's police cruiser, and asked him if he would come to the Newry Fire Station to be interviewed. Nielsen said that he would.

[¶ 11] Once at the fire station, Detective King brought Nielsen to an upstairs room and removed his handcuffs. The room was set up like a classroom, and King and Nielsen sat at separate tables opposite one another during the interview. A second detective was also present during this interview. Prior to the interview, King asked Nielsen if he was hungry, he stated that he was, and King sent Trooper Hanson to get him a sandwich. After Nielsen had eaten, King read him his *Miranda* rights again. Nielsen stated that he understood his rights and wanted to speak with King at that time. Nielsen then confessed to killing all four victims, giving a detailed account of the crimes.

[¶ 12] Following his indictment, Nielsen filed a motion to suppress all the statements he made to police on the evening of September 4, as well as all physical evidence obtained as a result of those statements. In its order on Nielsen's motion to suppress, the court found that only one statement made by Nielsen in the course of his interactions with police on September 4 should be suppressed: his statement to Trooper Hanson that it had been awhile since the killings, made after Nielsen told Hanson that he had killed some people and before he had received *Miranda* warnings. The court denied Nielsen's motion to suppress as to all other statements and the evidence obtained as a result of those

statements. Nielsen subsequently entered a conditional guilty plea to all four counts of murder, and was thereafter sentenced to four concurrent terms of life imprisonment.[1] This appeal followed.

## II. DISCUSSION

[¶ 13] Nielsen contends that his statements to police must be suppressed on numerous grounds, including that: (1) he was in custody at the time he made his initial incriminating statement to Trooper Hanson and thus this statement was taken in violation of his *Miranda* rights; (2) the *Miranda* warnings administered by Hanson were defective; (3) Nielsen did not knowingly, intelligently, and voluntarily waive his rights; (4) Nielsen invoked his right to counsel; and (5) none of Nielsen's statements were voluntary. The only contention that merits discussion is Nielsen's claim that he invoked his right to counsel.

### A. Legal Standards

■ [¶ 14] On a motion to suppress, this Court reviews the motion court's factual findings for clear error and its legal conclusions, including its ultimate determination of whether statements should be suppressed, de novo. *State v. Grant*, 2008 ME 14, ¶ 18, 939 A.2d 93, 99.

■ [¶ 15] The United States Supreme Court established in *Miranda v. Arizona* that, pursuant to the Fifth Amendment, a suspect subject to custodial interrogation has the right to consult with an attorney and to have an attorney present during questioning. 384 U.S. 436, 469–70, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). If a defendant invokes his right to counsel at any time during an interview with police, "he is not subject to further questioning

---

1. In his conditional guilty plea, Nielsen also preserved for appeal the court's September 19, 2007, order finding him competent to

stand trial. Nielsen, however, has not raised that issue in this appeal.

until a lawyer has been made available or the suspect himself reinitiates conversation." *Davis v. United States,* 512 U.S. 452, 458, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994); *see also State v. King,* 1998 ME 60, ¶ 9, 708 A.2d 1014, 1017 (providing that Maine courts apply the *Davis* rule in assessing invocations of the right to counsel).

[¶ 16] In order to invoke one's Fifth Amendment right to counsel, one must do so unambiguously. *Davis,* 512 U.S. at 459, 114 S.Ct. 2350. "[I]f a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning." *Id.* However, an ambiguous assertion of the right to have counsel present allows further inquiry into whether a defendant is, in fact, invoking that right or whether he wishes to continue the interrogation without counsel present. *Id.* at 461–62, 114 S.Ct. 2350. Whether a defendant has invoked his right to counsel is an objective inquiry. *Id.* at 458–59, 114 S.Ct. 2350.

[¶ 17] Once in custody, a defendant does not necessarily invoke his right to counsel every time he uses the word "attorney." *State v. Curtis,* 552 A.2d 530, 532 (Me.1988). In *Davis,* while being questioned by investigative agents, the defendant said, "Maybe I should talk to a lawyer." 512 U.S. at 455, 114 S.Ct. 2350. The Supreme Court concluded that this statement, especially in light of the defendant's subsequent clarification that he did not wish to speak to an attorney at that time, did not amount to an unambiguous invocation of the right to counsel. *Id.* at 462, 114 S.Ct. 2350. Similarly, in *State v. Alley,* the defendant's statement, in response to Miranda warnings, that his right to an attorney meant that "I should wait

until I see a lawyer," was found to be an ambiguous invocation of the right to counsel, and his clarification that he would speak with the police officer at that time served as an unambiguous, valid waiver of the right. 2004 ME 10, ¶ 28, 841 A.2d 803, 811. Finally, a defendant's statement that he had "talked too much the way it is anyway, without a lawyer" did not amount to even an ambiguous request for an attorney. *State v. McCluskie,* 611 A.2d 975, 977 (Me.1992).

B. Nielsen's Statement Regarding Counsel

[¶ 18] In the present case, the court found that the only statement made by Nielsen that could possibly be construed as an invocation of the right to counsel was his statement in the police cruiser, in response to his father's question of whether Nielsen should wait for counsel, that it was "not a bad idea." The court also found that Trooper Hanson thereafter told Nielsen that it was his decision whether or not he spoke to detectives when they arrived, and that Nielsen responded that he wanted to talk. The record supports these factual findings.

[¶ 19] The court also addressed what weight should be given to Trooper Hanson's statement to Nielsen, upon returning to the police vehicle after finding the bodies of the first two victims, that Hanson knew Nielsen had "invoked [his] rights and [he] want[ed] to speak to counsel." The court determined that although this statement could lend support to a finding that Nielsen had invoked his right to counsel at some point, it more likely resulted from the stress of the situation and Hanson's desire to honor Nielsen's request to only tell his story once. Accordingly, the court concluded that the overall circumstances did not lead to the conclusion that Nielsen, at any time on September 4, invoked his

right to counsel. We agree with this assessment.

■ [¶ 20] First, Nielsen's statement that waiting for an attorney was "not a bad idea" is not the kind of unambiguous invocation of the right to counsel required by *Davis*. Furthermore, to the extent this statement constituted an ambiguous request for an attorney, Trooper Hanson properly reiterated to Nielsen that it was his decision whether or not he spoke with police, and Nielsen reaffirmed his willingness to do so. This follow-up question served to clarify that Nielsen was not, at that time, invoking his right to counsel.

■ [¶ 21] In addition, Trooper Hanson's statement to Nielsen "—I know you invoked your rights and you want to speak to counsel"—must be understood in the context within which it was made. The suppression court's analysis is compelling:

> Although Hanson's wording, standing alone, would be persuasive evidence that Defendant had invoked his right to counsel, the totality of the evidence supports a different conclusion. First, when questioned regarding his statement Hanson testified that he had not intended to imply that Defendant had invoked his right to counsel. Rather, Hanson stated that he was merely showing respect for Defendant's desire to only tell his story once by making clear that he only wanted Defendant to tell him where the third body was so that he could make sure that the victim was not alive and injured. Although it is conceivable that Hanson's explanation is merely an after the fact rationale, the context in which his statement came about does not support that conclusion. Rather, the evidence shows that Hanson was for some period of time the officer in charge of a grisly multiple victim homicide and had just prior to his statement discovered the scattered remains of human bod-

ies. Under these circumstances, it was perfectly understandable that Hanson might not precisely craft his question to Defendant. Therefore, the State has met its burden of proving by a preponderance of the evidence that Defendant did not unequivocally request counsel be present at any point during the evening of September 4, 2006 through the early morning of September 5, 2006.

We discern no error in the foregoing analysis of Trooper Hanson's statement, nor with the court's ultimate conclusion that Nielsen did not invoke his right to counsel.

[¶ 22] Finally, even if we were to disagree with the suppression court's analysis of Trooper Hanson's statement, we reiterate that whether a suspect has invoked his *Miranda* right to counsel is an objective inquiry; accordingly, any subjective belief of Hanson that Nielsen had invoked his right to counsel would not be conclusive on this issue.

[¶ 23] For the reasons we have explained, the court correctly concluded that none of Nielsen's subsequent statements should be suppressed. We find Nielsen's remaining contentions to be without merit and do not separately address them.

The entry is:

Judgment affirmed.