STATE OF MAINE                                    SUPERIOR COURT
PENOBSCOT, ss.        FILED                        CRIMINAL ACTION
                                                  DOCKET NO: CR-09-761
                     AUG 3 1 2010                 WRA-PEN - 8/31/2010

STATE OF MAINE,      PENOBSCOT JUDICIAL CENTER
              PENOBSCOT COUNTY SUPERIOR COURT
                     BANGOR DISTRICT COURT
        Plaintiff,                           )
                                             )
vs.                                          )    DECISION & ORDER ON
                                             )    DEFENDANT'S MOTION TO
                                             )    SUPPRESS
COLIN  KOEHLER,                              )
                                             )
        Defendant.                           )

Pending before the Court is the defendant's Motion to Suppress, filed pursuant to

M.R. Crim. P. 41A, in which the defendant seeks to suppress various statements obtained

by law enforcement officers during the course of investigating the death of Holly

Boutilier. Hearing on the motion was held on May 25, 2010, and on July 1, 2010. The

specific issues raised by the defendant's motion are: (1) whether detectives obtained

statements during a custodial interrogation in violation of *Miranda v. Arizona*, 384 U.S.

436 (1966);  (2) whether the statements the defendant made during the custodial

interrogation were "voluntary" within the meaning of Art. I, § 6 of the Maine

Constitution and; (3) whether statements the defendant allegedly made to other inmates in

Penobscot County Jail and relayed to law enforcement offers were obtained in violation

of the defendant's Fifth Amendment right against self-incrimination and Sixth

Amendment right to counsel.

## BACKGROUND

As alleged by the State, the defendant, along with the co-defendant, Justin

Ptasznski, met Holly Boutilier on the Saturday, August 8, 2009, while walking in the area

1

of downtown Bangor. The defendant and Ptaszynski allegedly led Ms. Boutilier to a secluded area on the banks of the Penobscot River frequented by area homeless persons. The defendant and Ms. Boutilier entered a shack seasonally occupied by Ansel Gould, a member of the Bangor homeless community. It is the State's position that the defendant brandished a weapon and stabbed Ms. Boutilier at some point when she became distracted while standing in the shack. Gould discovered Ms. Boutilier's body in the shack on Sunday, August 9, 2009.

After discovering Ms. Boutilier's body, Gould contacted the Bangor Police Department. Detectives Timothy Cotton and Brent Beaulieu were among the BPD officers responding to the call and assumed duties as lead investigators. After gathering physical evidence and conducting interviews with Ptaszynski and other friends of the defendant, Detectives Cotton and Beaulieu confirmed certain suspicions that the defendant may have been involved in the death of Ms. Boutilier.

On August 11, 2009, BPD detectives sought and obtained a search warrant for the defendant's Bangor residence. BPD officers converged on the defendant's apartment to execute the search warrant, notified him of police presence, and requested entry. The defendant initially refused to answer the door and failed to answer repeated calls to his phone. Following a three-hour standoff, the Bangor Special Response Team ("SRT") was given orders to take the defendant into custody. SRT inserted tear gas into the defendant's apartment in order to induce compliance and remove him from the premises. Shortly after the administration of tear gas, the defendant emerged from the apartment.

SRT immediately took the defendant into custody, placed him in wrist restraints, and escorted him to an unmarked police cruiser occupied by BPD Detectives Cotton and

Beaulieu. Once in the cruiser, and while in route to the BPD stationhouse only a few blocks away, Detective Cotton administered *Miranda* warnings from a card provided by the Maine Attorney General's Office.

Once at the stationhouse, the Detectives Cotton and Beaulieu placed the defendant in an interview room and removed his wrist restraints. Detectives Cotton and Beaulieu proceeded to interrogate the defendant for the better part of 3.5 to 4 hours before the defendant, after Detective Cotton's second recitation of *Miranda* warnings, asked why he had been not provided a lawyer and indicated that he would only continue talking to them with a lawyer present. At that point, Detectives Cotton and Beaulieu terminated the interview and transported the defendant to the Penobscot County Jail for formal booking on murder charges.

The State seeks to introduce at trial certain statements the defendant made while being interrogated by Detectives Cotton and Beaulieu. The defendant claims that the statements he made during the taped interview of August 11, 2009 were obtained in violation of *Miranda* and otherwise rendered involuntarily. The defendant seeks suppression of all statements made during the interview.

While housed in Penobscot County Jail, the defendant allegedly made certain statements to other inmates potentially implicating himself in the death of Ms. Boutilier. The inmates, in turn, relayed the substance of these incriminating statements and admissions to law enforcement authorities through a series of jailhouse interviews conducted by Detectives Cotton and Beaulieu. The defendant denies having made the statements and maintains that such statements were nonetheless procured by active police

involvement with the jailhouse informants, and therefore, obtained in violation of his Sixth Amendment right to counsel.

## DISCUSSION

A. The August 11, 2009 Interrogation

1. *Miranda* Waiver

The State concedes that the defendant was "in custody" at the time he emerged from his residence and SRT members placed him in handcuffs. *See State v. Poblete*, 2010 ME 37, ¶ 22 n.5, 993 A.2d 1104, 1101 (quoting *State v. Michaud*, 1998 ME 251, ¶ 4, 724 A.2d 1222, 1226) (outlining the objective factors Maine courts use to determine whether a person is "in custody"). Members of SRT escorted the defendant approximately 75 feet from the entrance of his apartment to the unmarked police cruiser occupied by BPD Detectives Cotton and Beaulieu. The record before the court, including the Detective Cotton's testimony during the May 25, 2010, hearing, discloses that BPD officers did not direct any questions to the defendant as he was being escorted to, and ultimately placed in, the unmarked police cruiser. The first verbal contact between law enforcement officials and the defendant occurred at the moment Detective Cotton made sure the person who had emerged from the gassed apartment was, in fact, the defendant. Immediately thereafter, Detective Cotton recited *Miranda* warnings from a card provided by the Maine Attorney General's Office. Detectives Cotton and Beaulieu then transported the defendant back to the BPD and began interrogating the defendant in the late afternoon of August 11, 2009. *State v Dion*, 2007 ME 87, ¶ 21, 928 A.2d 746, 750 (citing *State v. Bridges*, 2003 ME 103, ¶ 23, 829 A.2d 247, 254) ("A person who is in custody and subject to interrogation must be advised of the rights referred to in *Miranda v. Arizona* in

order for statements made during the interrogation to be admissible against him or her at trial.").

Whether the statements the defendant made during the stationhouse interview were a product of a valid waiver of his *Miranda* rights, including his Fifth Amendment right to have counsel present during the interview, is the focus of the first part of the defendant's Motion to Suppress.

Among the foundational principles infused into *Miranda* jurisprudence, "a suspect subject to custodial interrogation" must be informed of "the right to consult with an attorney and to have an attorney present during questioning." *State v. Neilsen*, 2008 ME 77, ¶ 15, 946 A.2d 382, 386 (citing *Miranda v. Arizona*, 384 U.S. 436, 469-70, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966)). In order for the suspect to effect a valid waiver of his *Miranda* rights, the State carries the burden of proving, by a preponderance of the evidence, that any statements obtained during a custodial interrogation "were preceded by clear Miranda warnings," *State v. Langill*, 567 A.2d 440, 444 (Me. 1989), and that the waiver itself was made "knowingly, intelligently, and voluntarily," *State v. Coombs*, 1998 ME 1, ¶¶ 13, 15, 704 A.2d 387, 391-92 (citation omitted).

At that point when the defendant entered the unmarked police cruiser, Detective Cotton administered, verbatim from a card provided by the Maine Attorney General's Office, *Miranda* warnings. A review of the audio recording, supplemented by a written transcript, reveals the following verbal exchange between Detective Cotton and the defendant:

> Detective Cotton (DC): What's your name sir? Colin what? Ok, Colin I'm a law enforcement officer, I to ask you some questions. Before I do, I want to explain your

rights. You have an absolute right to remain silent. Do you understand that?

Colin Koehler (CK): Yeah.

DC: Anything you say can and will be used against you in a court of law. Do you understand that?

CK: Yeah.

DC: You have the absolute right to the advice of a lawyer before any questioning and the presence of a lawyer here with you during questioning. Do you understand that?

CK: Yup.

DC: If you . . . does that mean you understand? Ok. If you cannot afford a lawyer one will be furnished to you free before any question if you desire. Do you understand that?

CK: Yeah.

DC: Ok. If you decide to answer questions now, with or without an attorney present you have the right to stop answering at any time or to stop at any time until you can talk to a lawyer. Do you understand that?

CK: Yeah.

DC: Now having all those rights which I just explained to you in mind do you wish to answer questions at this time?

CK: Sure.

(Tr. of 8/11/09 Interview at 1.) Evident from the exchange, Detective Cotton administered clear *Miranda* warnings at the critical moment when the SRT officers placed the defendant in an unmarked police cruiser.[1] The defendant has presented no evidence to suggest that Detective Cotton's *Miranda* recitation was unclear, misread or incomplete.

More importantly, the defendant's replies to Detective Cotton's *Miranda* recitation "demonstrate[d] an intentional relinquishment or abandonment of known rights." *State v. Lockhart*, 2003 ME 108, ¶ 22, 830 A.2d 433, 442 (citing *Coombs*, 1998

---

[1] During the May 25, 2010, suppression hearing, Detective Cotton testified that he did not recall anyone speaking with the defendant prior to the *Miranda* recitation.

ME 1, ¶¶ 6, 13-15, 704 A.2d at 389, 392). Detective Cotton endeavored to determine whether the defendant understood each of his rights and the defendant responded to Detective Cotton's initial *Miranda* reading with answers indicative of an understanding for each of the rights recited. *Id.* Detective Cotton also asked the defendant a cumulative question intended to determine whether he fully understood his rights, and whether he would nonetheless be willing to answer police questions. *See, e.g., Lockhart*, 2003 ME 108, ¶ 22, 830 A.2d at 442. As in *Lockhart*, the defendant's explicit answers to Detective Cotton's *Miranda* recitation reflects not only an intelligent understanding the rights themselves, but also appreciation for the potential risks of proceeding through the interview without counsel. *Id.* The Court's review of the audio recording that captured the verbal exchange between Detective Cotton and the defendant does not disclose the type of police "overreaching" or "coercion" that would render the defendant's waiver involuntary. *Cf. Colorado v. Connelly*, 479 U.S. 157, 170 (1986) ("The sole concern of the Fifth Amendment, on which Miranda was based, is governmental coercion. . . . Indeed, the Fifth Amendment privilege is not concerned with moral and psychological pressures to confess emanating from sources other than official coercion.") (internal quotation marks omitted) (citations omitted). None of the psychological or coercive pressures imported from cases like *Connolly* appear to have unduly influenced the defendant's decision to answer police questions, and the audio recording exposes the defendant's calm, intelligent demeanor while both listening to and answering the recitation of his *Miranda* rights. In the absence of any compelling evidence to the contrary, the state has carried its burden of proving, by a preponderance of the evidence,

7

that the defendant affected a knowing, intelligent, and voluntary waiver of his *Miranda* rights when he agreed to submit to the police questioning.

Toward the end of the four-hour interview, Detective Cotton, apparently irritated by what he thought were evasive answers, again advised the defendant of his *Miranda* rights. Upon reaching the Miranda warning involving his right to have counsel appointed and present during the interrogation, the defendant indicated that he would only continue to answer questions with counsel present:

> Detective Cotton (DC): Do you know what I'm going to do right now, I'm going to do this again. I read you these earlier; I'm going to read them to you again. You listened to them very carefully, you listed to them last time, alright, and you mentioned that you wanted to talk to me. Right, do you recall that? It was clear in the car and on tape. I am a law enforcement officer and I want to ask you some questions but before I do I want to explain your rights. . . . this is the second reading.

> DC: You have the absolute right to remain silent, do you understand that? Could you say yes or no please.
> Colin Koehler (CK): Yes.

> DC: Anything you say can and will be used against you in a court of law, do you understand that?
> CK: Yes.

> DC: You have an absolute right to advice of a lawyer before any questioning and to the presence of lawyer here with you during questioning, do you understand that?
> CK: Yes.

> DC: If you can't afford a lawyer one will be furnished for you free before any questioning if you so desire, do you understand that?
> CK: Yes, why didn't I get that?

> . . . .

> CK: Why didn't I get a lawyer?
> DC: Let me finish before you decide what you want to do.

> DC: If you decide to answer question now, with or without a lawyer present you have the right to stop answering at any time or stop answering at any time until you talk to a lawyer. This is what I read you already, do you understand that?
> CK: Yes.
>
> . . . .
>
> DC: No[w] having all those rights which I just explained to you in mind, do you want to answer questions at this time?
> CK: [W]ith a lawyer.

(Tr. of 8/11/09 Interview at 105-06.) Detectives Cotton and Beaulieu, consistent with constitutional demand, terminated the interview at that very moment the defendant unambiguously indicated he would proceed only with a lawyer present. At no point during the interview, prior to the Detective Cotton's second recitation of *Miranda* warnings, did the defendant unambiguously invoke his right to have counsel present or unambiguously intimate that he no longer wanted to answer police questioning. *See, e.g., Nielsen,* 2008 ME 77, ¶ 16, 946 A.2d at 387 (citing *Davis v. United States,* 512 U.S. 452, 459 (1994)) (providing that a criminal defendant must "unambiguously" invoke the Fifth Amendment right to counsel). The question then becomes whether defendant can be said to have properly understood, and thus voluntarily waived, his Fifth Amendment right to counsel by later invoking the right following Detective Cotton's second reading of *Miranda.*

Despite the defendant's later invocation of his right to counsel, perhaps clouding the issue of whether he properly understood this *Miranda* rights after Detective Cotton's first recitation of them, the Court finds ample evidence to suggest that State has carried its burden of proving the defendant's waiver voluntary by a preponderance of the

evidence. Evident from the above analysis, the defendant's initial exchange with Detective Cotton reflects a knowing, intelligent and voluntary waiver of *Miranda* rights. *See State v. McCluskie*, 611 A.2d 975, 977 (Me. 1992) (noting that a clear reading of *Miranda* rights followed by an affirmative understanding of the rights before proceeding directly into questioning—even without an explicit "waiver" question—constitutes an implicit waiver of the right to remain silent and the right to counsel.) Beyond that, the Court finds that the defendant had a substantial education (having attended three years of college), and appeared at all times during the interview cognizant of the direction and tenor of the officers' questions. Even when Detectives Cotton and Beaulieu became confrontational, the defendant remained calm and continually deflected the detectives' questions for the better part of three and half hours.

The Court is persuaded that whatever prompted Detective Cotton to administer *Miranda* warnings for a second time, over three hours into the interview, had nothing do whether he thought the defendant had properly understood (and therefore, voluntarily waived) his rights at the critical moment when law enforcement officers first had meaningful contact with the defendant earlier in the afternoon. Rather, Detective Cotton appeared to have become frustrated with the defendant's attempts to thwart and redirect the questions without once conceding any involvement in the death of Ms. Boutilier. At no point in the interview, prior to Detective Cotton's second recitation of *Miranda*, did the defendant ambiguously or unambiguously invoke his right to counsel, his right to remain silent or otherwise insinuate that he wished to cease answering police questions. Furthermore, there is no evidence from which the Court could include that defendant did not understand his rights at the moment when he agreed to answer police questions. From

all of this, the defendant engaged in a "course of conduct" during the interrogation from which a voluntary "waiver can be clearly inferred from the [his] actions and words." *North Carolina v. Butler*, 441 U.S. 369, 373, 99 S. Ct. 1755, 60 L. Ed. 2d 286 (1979); *see also Berghuis v. Thomkins*, -- U.S. -- , 130 S. Ct. 2250, 2262-63 (2010).

2. Voluntariness of the Defendant's Statements Following Administration of *Miranda* Rights

In addition to the Fifth Amendment issues raised above, the defendant also maintains that any statements he made during the interview were not the result of the his "free will and rational intellect," and therefore involuntary. The Law Court recently reiterated that "[a] voluntary statement is one that is the result of a defendant's exercise of his [or her] own free will and rational intellect, as opposes to one that results from threats, promises, or inducements made to the defendant." *Poblette*, 2010 ME 37, ¶ 24, 993 A.2d at 1109-10 (quoting *State v. Lockhart*, 2003 ME 108, ¶ 29, 830 A.2d 433, 444) (alteration in original) (quotation marks omitted).

The State carries the burden of proving, beyond a reasonable doubt, that a suspect's statements are voluntary within the meaning of the Art. I, § 6 of the Maine Constitution. *Lockhart*, 2003 ME 108, ¶ 30, 830 A.2d at 444 (citation omitted); *State v. Rees*, 2000 ME 55, ¶ 8, 748 A.2d 976, 979 (citation omitted). The suppression court must employ a totality of the circumstances approach in determining whether a statements made during an interrogation are, in fact, voluntary. *Lockhart*, 2003 ME 108, ¶ 30, 830 A.2d at 444 (citation omitted). Ultimately, the question of voluntariness is determined by a multi-factored analysis, including:

> . . . the details of the interrogation; duration of the interrogation; location of the interrogation; whether the interrogation was custodial; the recitation of Miranda

> warnings; the number of officers involved; the persistence of the officers; police trickery; threats, promises or inducements made to the defendant; and the defendant's age, physical and mental health, emotional stability, and conduct.

*Id.* (quoting *State v. Sawyer*, 2001 ME 88, ¶ 9, 772 A.2d 1173, 1176).

The Court's review of the factors demonstrates that the statements made by the defendant during the interview with Detectives Cotton and Beaulieu were a product of free will and rational intellect. The State does not dispute that the defendant was "in custody" throughout the interview and that Detectives Cotton and Beaulieu, at times, become confrontational with the defendant. Viewing the August 11, 2009, interrogation through the lens of the *Lockhart/Sawyer* factors however, reveals that the defendant's statements were, in fact, voluntary beyond a reasonable doubt.

The Court's review of the video recording that captured the interrogation shows that the defendant remained calm and largely receptive to the detectives' questioning throughout the 3.5 to 4 hour interview. *See State v. Gosslin*, 594 A.2d 1102, 1105 (noting that an interrogation lasting three hours was "not so long a time as to constitute coercion"). The detectives had removed the defendant's wrist restraints and at no point did Detectives Cotton and Beaulieu threaten the defendant or use physical force against him. *Id.*; *Poblete*, 2010 ME 37, ¶ 24, 993 A.2d at 1110. Although the tenor of the interrogation became fleetingly confrontational during certain moments, with the detectives raising their voices and getting closer to the defendant, Detectives Cotton and Beaulieu were doing no more than pointing out factual inconsistencies between the defendant's statements and the physical evidence law enforcement authorities had already gathered through course of their investigation. *See, e.g., State v. Knights*, 482 A.2d 436,

12

442 n. 4 (1984) ("Mere admonitions or exhortations to tell the truth will not, by themselves, render a statement involuntary") (citation omitted); *State v. Candage*, 549 A.2d 355, 359-60 (Me. 1988) (noting that confrontational interviewing practices will not render statements obtained involuntary). Nor did Detectives coerce the defendants statements by promises of leniency, *see State v. Dion*, 2007 ME 87, ¶ 33, 928 A.2d 746, 752, employ trickery or deception to elicit the defendant's responses, *see State v. Sawyer*, 2001 ME 88, ¶ 9, 772 A.2d 1173, 1176, or affirmatively mislead the defendant regarding his constitutional rights, *see State v. McConkie*, 2000 ME 158, ¶¶ 10-11, 755 A.2d 1075, 1078-79. Detectives Cotton and Beaulieu employed a forthright, if not entirely candid, approach to questioning the defendant on August 11, 2009, and neither the video recording, nor the transcript of the interview, shows a level of police coercion that would render the defendant's statements involuntary within the meaning prescribed by Law Court and Art. I, § 6 of the Maine Constitution.

The defendant's own demeanor also castes doubt over any claim that his statements were the product of some internal compulsion. *See State v. Caouette*, 446 A.2d 1120 (Me. 1982) ("While a claim of compulsion will frequently be predicated upon police elicitation or conduct, that element is not a *sine qua non* for exclusion under the exclusionary rule inherent in the guarantee against self-incrimination."). The Detectives themselves described the defendant as being "mellow" during the interview, and asked the defendant if he had recently used marijuana. While admitting to marijuana use in the past, the defendant responded that he had not used marijuana in the hours preceding the interrogation, and affirmatively denied ingesting any other prescription medications. Furthermore, the defendant's argument that his statements were not voluntary would be

more convincing if the defendant had made statements implicating himself in crime, but the record shows that defendant made repeated efforts to distance himself from Ms. Boutilier throughout the entire interview and at no point conceded to being involved with her death. There is simply no indication that the defendant suffered from the type physical, emotional, or psychological infirmity that would render statements, in any way, a product of internal compulsion. *Id.*

From all of the foregoing, the State has carried its burden of proving, beyond a reasonable doubt, that the statements made by defendant during the August 11, 2009, custodial interrogation were a product of his own free will and rational intellect, and therefore, "voluntary" with the meaning of Art. I, § 6 of the Maine Constitution.


## B. Defendant's Statements to Fellow Inmates in the Penobscot County Jail

The defendant also seeks to suppress statements he allegedly made to other inmates while incarcerated at Penobscot County Jail. As a general matter, the statements obtained by inmates Richard Maloney, Willie Harper, and Vincent Robinson appear to implicate the defendant in the death of Ms. Boutilier. The defendant alleges that these inmates obtained the statements "in violation of the . . . Fifth and Sixth Amendment" while acting "as agents for State." Consistent with United States Supreme Court precedent, the Law Court has recognized:

> The sixth amendment requires suppression of an accused's statement if, after the initiation of adversary proceedings, the State, or its agent, has deliberately elicited an incriminating statement, *see Massiah v. United States*, 377 U.S. 201, 206, 12 L. Ed. 2d 246, 84 S. Ct. 1199 (1964), or the State has intentionally created a situation "likely to induce a defendant to make incriminating statements," *see*

> *United States v. Henry*, 447 U.S. 264, 274, 65 L. Ed. 2d
> 115, 100 S. Ct. 2183 (1980).

*State v. Moulton*, 481 A.2d 155, 160-61 (Me. 1984), aff'd, *Maine v. Moulton*, 474 U.S. 159, 106 S. Ct. 477, 88 L. Ed. 2d 481 (1985). As in *Moulton*, the defendant argues that the inmates obtained incriminating statements from him while under the tacit employ of BPD detectives. To the extent that this is true, the Court agrees that any statement the defendant made to inmates Maloney, Harper, or Robinson, under circumstances prescribed by *Moulton* and *Henry*, must be suppressed given the constitutional dimension of his Sixth Amendment rights, which at a minimum "guarantees the accused, at least after the initiation of formal charges, the right to rely on counsel as a 'medium' between him and the State." *Maine v. Moulton*, 474 U.S. 159, 176 (1985). The broad assertion, however, necessarily requires the Court to differentiate between those statements the defendant allegedly made before the detectives became involved with the inmates and those statements related to BPD detectives during follow-up conversations. In other words, it is the *timing* of the defendant's statements and the circumstances of their disclosure to BPD detectives that serves as the ultimate arbiter of their admissibility at trial.[2]

1. Statements Made to Inmate Richard Maloney

Inmate Richard Maloney, while incarcerated at Penobscot County Jail, informed a

---

[2] The Court recognizes that the rulings that follow may prove problematic at trial for the simple reason that the inmates expected to present testimony concerning the defendant's alleged admissions and other incriminating statements may not recall exactly *when* the statements occurred, especially with respect to whether the defendant made them before or after *Henry* would serve as barrier to their admissibility. It will be difficult for the State to persuade the Court to admit evidence of the defendants' statements that is not consistent with the inmates' motion testimony. In other words, the witness would not be permitted to add the content of statements made by the defendant after the inmate had met with the police to the content of the statements that the defendant made prior to meeting with the police. The Court will rule on any objections as they may arise during trial proceedings.

15

a sheriff's detective that he had obtained information about the murder of Ms. Boutilier. The sheriff's detective relayed the information to Detective Beaulieu, who along with Detective Cotton, met Maloney in a room at the Penobscot County Jail on August 17, 2009. From the onset of the interview, Maloney indicated he sought "trustee" status for the remainder of his period of incarceration in exchange for the information he had concerning the defendant's involvement with the death of Ms. Boutilier. Detective Beaulieu intimated that he would relay Maloney's request to persons responsible for making the "trustee" determination.

Subsequently, Maloney recounted for detectives the content of a conversation he allegedly had with the defendant while in prison. The substance of the conversation included statements the defendant made concerning how he had initially met Ms. Boutilier, and how his strained relationship with his current girlfriend, Jessica Palmer, who had accused the defendant of cheating on her with Ms. Boutilier, may have served as the motive for the crime. Maloney also described in some detail the manner in which defendant said he had stabbed Ms. Boutilier, including an admission that he stabbed her "multiple times" to the point where "her head was almost off." At the conclusion of the 15 minute interview, Detective Beaulieu instructed Maloney to not pose any direct questions or initiate conversations with the defendant, but stated that Maloney could otherwise relay any statements he overheard from the defendant while speaking with him in passing.

Prior to speaking with detectives, Maloney had not spoken to either of the other inmates involved in this motion to suppress, Robinson and Harper. While testifying at the hearing on this motion, Detective Cotton recalled that a recording of an August 27, 2009,

follow-up interview with Maloney "may exist," but that the interview produced no "earthshaking information" beyond what the detectives had already obtained during the initial interview on August 17, 2009.

From all of the evidence, the Court concludes that the content and substance of the defendant's statements, allegedly obtained by Maloney prior to his August 17, 2009, meeting with Detectives Cotton and Beaulieu, are admissible at trial. The Court thus deems as inadmissible any statements allegedly relayed by the defendant to Maloney and from Maloney to Detectives Cotton and Beaulieu after that date because Maloney was attempting to obtain trustee status and the Court cannot conclude that Maloney was acting as a mere "listening post," *see Henry*, 447 U.S. 664, 271 n. 9, after the August 17, 2009, interview. The audio recording of the August 17 interview explicitly discloses that Maloney stated to detectives that he "couldn't get [the defendant] to tell [him] everything," which, in the Court's view exposes the defendant's concerted effort, from that point forward, to actively procure incriminating statements from the defendant in order to better his own predicament while in prison. It is precisely this type of incentive "that the police knew or should have known" would create "a situation likely to induce [the defendant] to make incriminating statements without the assistance of counsel." *Id.* at 274.

The defendant maintains that none of the statements defendant allegedly made to Maloney should be admissible because Maloney had an existing "agency" relationship with Detective Beaulieu prior to the August 17 interview. Evident from the record, Maloney had previous ties to Detective Beaulieu stemming from information he provided on an unrelated robbery case. Coincidentally, Maloney had previously sought "trustee"

status from Detective Beaulieu in exchange for the information he provided on the robbery. In light of the Detective Beaulieu's previous dealings with Maloney, the defendant maintains that Maloney maintained an agency relationship with Detective Beaulieu at least until the time of the August 17, 2009, interview regarding the defendant. The argument, as a factual matter, fails to withstand analysis.

The information Maloney relayed to Detective Beaulieu concerning the unrelated robbery incident is entirely disconnected from the information he provided involving the defendant. Maloney did not specifically request to speak with Detective Beaulieu after informing correctional officers that he had information concerning the death of Ms. Boutilier. Moreover, the audio recording of the August 17 interview demonstrates that Maloney seemed surprised to see Detective Beaulieu in the jailhouse interview room. Upon entering the room, Maloney immediately expressed his unhappiness with the lack of results he had experienced in assisting Detective Beaulieu with the robbery case. Detective Beaulieu responded that he had done all he could to get Maloney "trustee" status after receiving information and explained that he had, in fact, made the call to prison officials. The record affirmatively shows that any "agency" relationship that might have existed between Maloney and Detective Beaulieu prior to the time Maloney came forward with information concerning the alleged admissions of the defendant had ended long before the August 17, 2009, interview.

2. Statements Made to Inmate Vincent Robinson

On August 30, 2009, shortly after BPD officers engaged in discussions with inmate Maloney, BPD detectives received a letter from inmate Vincent Robinson indicating that the defendant had "admitted on several occasions of killing Ms. Holly

18

Boutilier." (St.'s Ex. 3.) The letter explicitly informed the detectives that in exchange for the information Robinson wanted "time served on a probation violation." (*Id.*)

Detectives Beaulieu and Cotton met with Robinson on September 1, 2009. Robinson disclosed a conversation in which defendant allegedly admitted to stabbing Ms. Boutilier. Robinson also intimated that he knew that he could extract additional information from the defendant. Detectives Cotton and Beaulieu, as with inmate Maloney, warned Robinson not to approach the defendant or deliberately ask questions regarding the defendant's alleged involvement with Ms. Boutilier's death, but the detectives also advised Robinson that they would be interested in any further admissions made by the defendant in his presence. Near the conclusion of the interview, Detective Cotton intimated he would talk to the jail staff and Robinson's probation officer regarding his cooperation.

Subsequently, Robinson wrote two letters, dated September 1, 2009, and September 14, 2009, respectively, which indicated that the defendant had divulged additional information concerning his involvement with the death of Ms. Boutilier. In response, Detectives Cotton and Beaulieu met with Robinson on September 3, 2009, and again on September 14, 2009. Without delving into the substance of the follow-up interviews, it is clear to the Robinson made deliberate attempts to elicit incriminating information from the defendant after the September 1, 2009, interview with Detectives Cottons and Beaulieu. Based on the Court's review of the recordings of the interviews, in addition to Robinson's own testimony at the July 1, 2010, suppression hearing, Robinson obtained additional information from the defendant both with and without asking explicit questions. Robinson readily admits that he was "sneaky" in getting the defendant to

divulge information concerning where he had purchased the weapon allegedly used in Ms. Boutilier's murder. Robinson also served in some respect as a "jailhouse lawyer" and assisted the defendant in that capacity in the days following his September 1, 2009, meeting with Detectives Cotton and Beaulieu. It is evident from these purported dealings with the defendant that Robinson made deliberate efforts to elicit incriminating statements in the course of discussing possible defense strategies.

In short, the Court finds, with one exception,[3] that any admissions or incriminating statements obtained by Robinson after his September 1, 2009, meeting with BPD detectives are inadmissible at trial. Although Detectives Cotton and Beaulieu made clear to Robinson that he was not to act as an agent for the police, the detectives' promise to relay Robinson's cooperation to authorities in the jail system, coupled with the detectives keen interest in any further "specifics" the defendant communicated to him, "intentionally created 'a situation likely to induce the defendant to make in criminating statements.'" *Moulton*, 481 A.2d at 161 (quoting *Henry*, 447 U.S. at 274). That Robinson made three subsequent efforts to speak with law enforcement authorities after the September 1, 2009, meeting, is dispositive of the fact Robinson was clearly motivated to both initiate conversations with the defendant and relay the substance of those conversations to law enforcement authorities in exchange for personal benefit. To hold otherwise would ignore the inherent difficulty in establishing whether Robinson

---

[3] Excepted from this ruling are the statements the defendant allegedly made to Robinson during an episode in which another Penobscot County Jail inmate, Chris Goode, allegedly "confessed" to murdering Ms. Boutilier. At some point after September 1, 2009, the defendant allegedly confronted inmate Goode with a proposal to provide him with $250.00 bail money in exchange for Good's a written "confession" to the Boutilier murder. Apparent from the record, the defendant approached Robinson about the propriety of soliciting Goode to take the fall for Ms. Boutilier's murder. Robinson both observed and assisted the defendant in his effort, but because the scheme was entirely of the defendant's own design, and otherwise not part of the subversive, self-serving tactics Robinson had previously used to obtain statements from the defendant, Robinson may testify about his observations of the Goode "confession."

deliberately elicited statements from the defendant or merely served as a "listening post" subsequent to his September 1, 2009, interview with Detectives Cotton and Beaulieu.

### 3. Statements Made to Inmate Willie Harper

Inmate Willie Harper became involved with law enforcement officials on September 3, 2009, after inmate Robinson's August 30, 2009, letter noted that the defendant had also made certain admissions in the presence of Harper. On September 3, 2009, Detectives Cotton and Beaulieu met with Harper to discuss incriminating statements that the defendant allegedly made to him. Like Robinson, Harper also wanted some form of benefit, potentially involving charges pending at the time, in exchange for the information he intended to provide to Detectives Cotton and Beaulieu. Harper disclosed to detectives certain statements the defendant allegedly made concerning the location of the weapon used to stab Ms. Boutilier and the manner in which the defendant perpetrated the crime. Law enforcement officials conducted no follow-up interviews with Harper after the September 3, 2001, meeting with him. Therefore, there is no suggestion that Harper may had been improvidently eliciting incriminating statements from the defendant as an "agent" of the State precisely because the September 3, 2009, meeting reflected the only time Harper provided information to BPD detectives. Accordingly, the Court finds that the substance of the defendant's statements to Harper are admissible at trial.

The only outstanding issue with respect to the defendant's alleged admissions to Harper involve the issue of whether Harper could have obtained the information from Robinson subsequent to Robinson's first interview with Detectives Cotton and Beaulieu on September 1, 2009. From that date forward, Robinson clearly exhibited behavior

consistent with acting as official government informant than as opposed to mere "listening post." To the extent Harper learned anything from Robinson, following Robinson's September 1, 2009, meeting with BPD detectives, Harper's conversations with defendant would require suppression as statements from "agent" to "agent." Evident from the Court's review of the record, however, Harper could only have conversed with Robinson on part of September 1, September 2, and on part of September 3, 2009, and the record reflects that Harper had a handful of discussions with the defendant prior to September 1, 2009, during which the defendant allegedly made the incriminating statements Harper related to BPD detectives on September 3, 2009. Thus, the Court does not find Harper's information impermissibly tainted by Robinson's earlier September 1, 2009, interview with the police. The content of Harper's conversations with defendant, as stated above, are thus properly admissible into evidence at trial.

Cumulatively, the Court notes that the substance of the statements the defendant allegedly made to inmates Maloney, Robinson, and Harper preceding each of their initial meetings with Detectives Cotton and Beaulieu on August 17, September 1, and September 3, 2009, respectively, are admissible into evidence at trial. The various incriminating statements and admissions inmates Maloney and Robinson disclosed to detectives after those dates violate the Sixth Amendment protections proscribed by *Moulton* and *Henry*. The State, in supplemental briefing on this matter, has abandoned any attempts to introduce any of the admissions the defendant is alleged to have made to Maloney and Robinson after their initial meetings with detectives. (St.'s Supp. Mem. in Opp'n to Def.'s Mot. to Suppress at 8.) The State agrees that both inmates were clearly "after some sort of quid pro quo" and that detectives had set in motion a situation likely

22

to induce Maloney and Robinson to make efforts to deliberately elicit information despite direct instructions to refrain from to doing so. (*Id.*)

The entry is:

1. The defendant's Motion to Suppress statements obtained during the August 11, 2009, custodial interrogation is **DENIED**.

2. The defendant's Motion to Suppress the statements made to other inmates while incarcerated in Penobscot County Jail is **GRANTED**, in part, and **DENIED**, in part, consistent with the analysis of the this decision.

Dated: August 31, 2010

William R. Anderson
Superior Court Justice

23

State v. Colin Koehler
Docket No. BANSC-CR-2009-761


State's Attorney:
    Andrew Benson, ADA
    Attorney General's Office
    6 State House Station
    Augusta Maine 04333

Defense Attorneys:
    Peter Cyr, Esq.
    85 Brackett Street
    Portland Maine 04102


    Richard Hartley, Esq.
    15 Columbia Street Ste 301
    Bangor Maine 04401